# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BLUEBLADE CAPITAL OPPORTUNITIES LLC, a Delaware limited liability company, and BLUEBLADE CAPITAL OPPORTUNITIES CI LLC, a Delaware limited liability company,<br><br>        Petitioners,<br><br>    v.<br><br>NORCRAFT COMPANIES, INC., a Delaware corporation,<br><br>        Respondent. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | **C.A. No. 11184-VCS** |

## MEMORANDUM OPINION

Date Submitted: April 25, 2018
Date Decided: July 27, 2018

David A. Jenkins, Esquire and Robert K. Beste, Esquire of Smith, Katzenstein & Jenkins LLP, Wilmington, Delaware and Michael E. Davidian, Esquire of Blueblade Capital Opportunities LLC and Blueblade Capital Opportunities CI LLC, New York, New York, Attorneys for Petitioners Blueblade Capital Opportunities LLC and Blueblade Capital Opportunities CI LLC.

Raymond J. DiCamillo, Esquire and Kevin M. Gallagher, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware, Attorneys for Respondent Norcraft Companies, Inc.

**SLIGHTS, Vice Chancellor**

This statutory appraisal action arises out of a May 12, 2015, merger whereby Fortune Brands Home & Security, Inc. ("Fortune") acquired Norcraft Companies, Inc. ("Norcraft" or the "Company") (the "Merger") for $25.50 cash per share (the "Merger Price"). Petitioners, Blueblade Capital Opportunities LLC and Blueblade Capital Opportunities CI LLC (together, "Blueblade"), were Norcraft stockholders on the Merger's effective date and seek a judicial determination of the fair value of their Norcraft shares as of that date.

In an appraisal action under the Delaware General Corporation Law, the trial court's "fair value" determination must "take into account all relevant factors."[1] The relevance (or not) of certain factors "can vary from case to case depending on the nature of the [acquired] company," the nature of the process leading to the company's sale and, perhaps most importantly, the evidence adduced by the parties at trial in support of their respective valuation positions.[2] "In some cases, it may be that a single valuation metric is the most reliable evidence of fair value and that giving weight to another factor will do nothing but distort that best estimate. In other cases, "it may be necessary to consider two or more factors."[3] In all cases, however,

---

[1] 8 *Del. C.* § 262(h).

[2] *Merion Capital L.P. v. Lender Processing Servs., Inc.*, 2016 WL 7324170, at *16 (Del. Ch. Dec. 16, 2016).

[3] *DFC Global Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346, 388 (Del. 2017).

1

the trial court's determination respecting the "relevant factors" must be grounded in the evidentiary record and "accepted financial principles."[4]

I am cognizant of the Delaware Supreme Court's embrace of "deal price" as a strong indicator of fair value in *Dell* and *DFC*. Those decisions teach that deal price often will be a relevant factor in the trial court's fair value calculus— particularly where the respondent company was publicly traded and sold following a meaningful market check.[5] In both cases, however, despite having been urged to do so, the Supreme Court declined to adopt a rule that the deal price is presumptively reflective of fair value.[6] Mindful of *DFC* and *Dell*, I have considered carefully whether the Merger Price (less synergies) reflects the fair value of Norcraft as of the Merger date. For the reasons explained below, I am satisfied it does not.

---

[4] *Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd*, 177 A.3d 1, 22 (Del. 2017); *DFC*, 172 A.3d at 388 ("What is necessary in any particular [appraisal] case though is for the Court of Chancery to explain its [fair value calculus] in a manner that is grounded in the record before it.").

[5] *See Dell*, 177 A.3d at 35; *DFC*, 172 A.3d at 349, 351, 372; *cf. DFC*, 172 A.3d at 369 n.118 (explaining that a discounted cash flow analysis is "often used in appraisal proceedings when the respondent company was not public or was not sold in an open market check").

[6] *DFC*, 172 A.3d at 348 (rejecting the petitioner's (and others') argument that the Court should adopt a presumption in favor of the deal price, stating "[w]e decline to engage in that act of creation, which in our view has no basis in the statutory text"); *Dell*, 177 A.3d at 21–22 (noting "we doubt[] our ability to craft the precise preconditions for invoking such a presumption").

2

In this case, the evidence reveals significant flaws in the process leading to the Merger that undermine the reliability of the Merger Price as an indicator of Norcraft's fair value. There was no pre-signing market check; Norcraft and its advisors fixated on Fortune and never broadened their view to other potential merger partners. As the parties worked to negotiate the Merger agreement, Norcraft's lead negotiator was at least as focused on securing benefits for himself as he was on securing the best price available for Norcraft. And, while the Merger agreement provided for a thirty-five-day post-signing go-shop, that process was rendered ineffective as a price discovery tool by a clutch of deal-protection measures.

*Dell* reminded us that Delaware courts have "long endorsed" the "efficient market hypothesis" and emphasized "that the price produced by an efficient market is generally a more reliable assessment of fair value than the view of a single analyst, especially an expert witness who caters her valuation to the litigation imperatives of a well-heeled client."[7] I have heeded that guidance as well. Unfortunately, this case was tried before the Supreme Court decided *Dell*, and the record evidence regarding the efficiency of the market for Norcraft stock prior to the Merger is, in a word, thin. With that said, the evidence that can be drawn from the record reveals that, at the time of the Merger, Norcraft was fresh off an initial public offering of its stock, was

_____

[7] *Dell,* 177 A.3d at 24.

relatively thinly traded given the niche market in which it operated and was also thinly covered by analysts. Under these circumstances, I can discern no evidence-based rationale that would justify looking to the unaffected trading price of Norcraft's stock either as a standalone indicator of fair value or as a data point underwriting the use of a deal-price-less-synergies metric.

Having concluded that flaws in the sales process leading to the Merger undermine the reliability of the Merger Price as an indicator of fair value, and that the evidence *sub judice* does not allow for principled reliance upon the efficient capital markets hypothesis, I have turned to a "traditional valuation methodology," a discounted cash flow ("DCF") analysis, to calculate the fair value of Norcraft as of the Merger date.[8] In my view, given the evidence in this record, a DCF-based valuation provides the most reliable means by which to discharge the Court's statutorily mandated function to appraise Norcraft.

Not surprisingly, both parties proffered expert testimony regarding Norcraft's fair value on a DCF basis. And, as we have come to expect in appraisal litigation, the experts' DCF analyses yielded valuations that are miles apart. Neither expert walked the high road from start to finish during their respective DCF journeys. That is to say, both experts, at times, made choices in their analyses that were not

---

[8] *See Highfield Capital, Ltd. v. AXA Fin., Inc.* 939 A.2d 34, 47 (Del. Ch. 2007) (describing DCF as a "traditional valuation methodology").

4

supported by the evidence or not supported by "accepted financial principles" in order to support a desired outcome. I have, therefore, borrowed the most credible components of each expert's analysis to conduct my own DCF valuation, in my best effort to obey our appraisal statute's "command that the Court of Chancery undertake an '*independent*' assessment of fair value" when performing its mandated appraisal function.[9] As explained below, my DCF analysis reveals a valuation of $26.16 per share.

Insofar as *Dell* and *DFC* require that the trial court carefully consider deal price before disregarding it altogether, I have returned to the Merger Price as a "reality check" before locking in my DCF valuation as the last word on fair value. Having done so, I am satisfied that the $0.66 per share delta between the Merger Price and my DCF valuation of Norcraft is a product of the identified flaws in Norcraft's deal process. Accordingly, I conclude that the fair value of Norcraft as of the Merger date was $26.16 per share.

## I. FACTUAL BACKGROUND

I recite the facts as I find them based on the evidence presented during a four-day trial. That evidence comprises testimony from thirteen fact witnesses

---

[9] *Dell*, 177 A.3d at 21 (quoting *Golden Telecom, Inc. v. Global GT LP*, 11 A.3d 214, 218 (Del. 2010) (emphasis in original)); *see also Gholl v. eMachines, Inc.*, 2004 WL 2847865, at *5 (Del. Ch. Nov. 24, 2004) (noting that both parties bear a burden of proof in a statutory appraisal trial and holding that, "[i]f neither party satisfies its burden . . . the court must then use its own independent business judgment to determine fair value").

(some presented live and some by deposition) and three live expert witnesses, along with over 500 exhibits. I accord the evidence the weight and credibility I find it deserves. As noted, both parties carried a burden to prove their respective valuation positions by a preponderance of the evidence. Thus, Petitioners were obliged to prove that their proffered valuation of Norcraft, a DCF-based valuation of $34.78 per share, represented Norcraft's fair value as of the Merger; Respondent's burden was to prove that its proffered valuation of $21.90 per share, the Merger Price less synergies, was Norcraft's fair value as of the Merger. With these competing burdens in mind, I find that the following facts were proven by a preponderance of the evidence.

## A. Parties and Relevant Non-Parties

Respondent, Norcraft, is a Delaware corporation in the cabinetry manufacturing business.[10] Prior to the Merger, Norcraft's stock traded on the New York Stock Exchange.[11] On May 12, 2015, Fortune acquired Norcraft for $25.50 cash per share in the Merger.[12] In connection with that transaction, Norcraft merged

---

[10] JX 267 ("Norcraft FY2014 10-K") at 1, 6; JX 221 ("Merger Agreement"), pmbl. & § 1.3.

[11] JX 267 (Norcraft FY2014 10-K) at 1.

[12] Joint Pre-Trial Stipulation and Order ("PTO") ¶¶ 2y, 2ff. I commend the parties, and counsel in particular, for the substantial effort that was undertaken to prepare and submit comprehensive pre-trial factual stipulations.

with an indirect, wholly-owned subsidiary of Fortune, Tahiti Acquisition Corp. ("Tahiti"), with Norcraft surviving as a wholly-owned Fortune subsidiary.[13]

Petitioners were Norcraft stockholders as of the Merger date and collectively held 557,631 shares of Norcraft common stock.[14] It is undisputed that they properly perfected their statutory appraisal right.

Non-party, Fortune, is a home and security products company with four business segments: cabinets, plumbing, doors and security.[15] Fortune sells its products through several sales channels, "including kitchen and bath dealers, wholesalers oriented to builders or professional remodelers, industrial and locksmith distributors [and] 'do-it-yourself' remodeling-oriented home centers . . . ."[16]

Non-parties, Mark Buller, Christopher Reilly, Michael Maselli, Harvey Wagner, Ira Zecher and Edward Kennedy served on Norcraft's board of directors (the "Board") at all relevant times.[17] Buller also served as the Chief Executive Officer of Norcraft (and its predecessors) from 2003 to the Merger's consummation

---

[13] JX 221 (Merger Agreement), pmbl. & § 1.3; *see* PTO ¶ 2y.

[14] PTO ¶¶ 2h, 2i. Blueblade acquired all of its Norcraft stock after the Merger was announced. PTO ¶¶ 2h, 2i.

[15] PTO ¶ 2g; JX 270 ("Fortune FY2015 10-K") at 6.

[16] JX 270 (Fortune FY2015 10-K) at 5.

[17] *See* PTO ¶ 2f.

in May 2015.[18] Non-party, Leigh Ginter, was the Chief Financial Officer of Norcraft (and its predecessors) from 2003 through the Merger's consummation.[19] And non-party, Eric Tanquist, was Norcraft's Vice President of Finance Administration from approximately 2007 through the Merger's consummation.[20]

Non-party, Christopher Klein, is Fortune's CEO and served in that capacity at all times relevant to this action.[21] Non-party, Robert Biggart, is Fortune's general counsel and served in that capacity at all relevant times.[22] And non-party, Jason Baab, served as Fortune's Vice President of Corporate Development and M&A at the time of the Merger.[23]

## B. Pre-Merger Norcraft

As of the Merger date, "Norcraft was a leading manufacturer of kitchen and bathroom cabinetry in the United States and Canada."[24] The Company sold its products primarily to kitchen and bathroom cabinet dealers in the home repair,

---

[18] PTO ¶ 2f; JX 3 (Buller Dep.) at 19:9–21. Buller was also the Chairman of Norcraft's Board at all relevant times prior to the Merger. JX 3 (Buller Dep.) at 19:9–21.

[19] PTO ¶ 2f; JX 1 (Ginter Dep.) at 18–19.

[20] PTO ¶ 2f; JX 2 (Tanquist Dep.) at 21:2–16.

[21] PTO ¶ 2g.

[22] *Id.*

[23] *Id.*

[24] PTO ¶ 2a.

8

remodeling and new home construction markets through four business divisions: Mid Continent Cabinetry, StarMark Cabinetry, UltraCraft Cabinetry and Urban Effects (a.k.a. Norcraft Canada).[25] Prior to the Merger, Norcraft regarded Fortune, American Woodmark Corporation ("American Woodmark") and Masco as its principal competitors.[26] It also faced competition from "a large number of smaller manufacturers."[27]

### 1. Buller and Two Private Equity Firms Acquire Norcraft's Operating Subsidiary in 2003

In October 2003, Buller, certain Buller family members and funds affiliated with the private equity firms Saunders, Karp & Megrue ("SKM") and

---

[25] PTO ¶¶ 2b, 2c; JX 267 (Norcraft FY2014 10-K) at 6–10. For FY2014, "kitchen and bathroom cabinet dealers accounted for [86%] of Norcraft's net sales, home builders accounted for [9%], and wholesale retailers, or home centers, accounted for [5%]." PTO ¶ 2b. "[A]pproximately 58% of [Norcraft's FY2014] net sales were to the home repair and remodeling market and the remaining net sales were to the new residential construction market." JX 267 (Norcraft FY2014 10-K) at 6. As of the Merger date, Norcraft, Fortune and Masco Corporation ("Masco") were the only three "dealer channel" cabinet manufacturers in the United States with a market share of over 5%. *See* JX 112 (Gabelli & Co., *The Home Improvement Opportunity*, published Jan. 29, 2015 ["Gabelli Report"]) at CITI-00053582. In the cabinetry industry, the "dealer channel" comprises third parties who purchase cabinets from manufacturers (or wholesalers) and sell them to end users. *See id.*; JX 12 (Baab Dep.) at 36:8–20. In 2014, nearly half of U.S. cabinet sales (representing approximately $6 billion) were made through the dealer channel, which is generally considered the most profitable sales channel in the cabinetry industry. *See* JX 112 (Gabelli Report) at CITI-00053582, CITI-00053595; JX 1 (Ginter Dep.) at 153:17–154:1; JX 5 (Klein Dep.) at 293:25–294:3.

[26] JX 267 (Norcraft FY2014 10-K) at 11.

[27] *Id.*

Trimaran Capital Partners ("Trimaran") acquired Norcraft Companies, L.L.C. for approximately $315 million (the "2003 Acquisition").[28] At the same time, Norcraft Companies, L.L.C. converted to a Delaware limited partnership, Norcraft Companies, L.P. ("Norcraft LP"), and Buller became the CEO of that entity.[29] For the next ten years, Norcraft LP operated as a privately-held company.

## 2. Norcraft and the Cyclical Cabinetry Industry

The undisputed evidence reveals that Norcraft operated in a cyclical industry.[30] As one naturally might expect, the cabinetry industry is directly affected by the home improvement industry, which, in turn, is affected by macro-economic conditions, including employment levels, demographic trends, availability of financing, interest rates and consumer confidence.[31] The cabinetry industry is also directly affected by housing starts, as a significant percentage of sales are connected

---

[28] JX 3 (Buller Dep.) at 16:3–24. As of 2003, Norcraft Companies, L.L.C. was the operating entity in Norcraft's organizational structure. JX 400 (Norcraft Amendment No. 5 to Form S-1, filed Oct. 30, 2013 ["Norcraft Amendment 5 to Form S-1"]) at 19. For purposes of this Memorandum Opinion, I have not distinguished SKM and Trimaran from the SKM and Trimaran funds that owned Norcraft common stock prior to the Merger.

[29] JX 27 (Mar. 29, 2004 Norcraft LP Press Release) at 2. Following the 2003 Acquisition, Norcraft LP became the operating entity in Norcraft's organizational structure. JX 400 (Norcraft Amendment 5 to Form S-1) at 19. Buller and his family collectively owned approximately 11% of Norcraft LP's equity. JX 3 (Buller Dep.) at 18:6–8.

[30] TT 21:6–11, 21:20–21 (Eldridge), 96:22–97:7 (Biggart), 607:23–608:1 (Clarke).

[31] JX 267 (Norcraft FY2014 10-K).

10

to new home construction.[32]  When housing starts decrease, as they often do for various reasons,[33] cabinet sales decrease as well.[34]

Norcraft was no exception to this cyclicality.  Norcraft LP enjoyed steady growth of its earnings before interest, taxes, depreciation and amortization ("EBITDA") from 2003 through 2006—$47 million (2003) to $80 million (2006).[35] This growth was fueled, in large part, by a significant acquisition in March 2002 and a boom in the United States housing market.[36]  Growth stalled, however, beginning in 2007, when Norcraft LP experienced the first of three consecutive years of declining sales and adjusted EBITDA.[37]  As is typical in classically cyclical businesses, Norcraft LP saw improved sales beginning in 2010, although its adjusted EBITDA continued to decline until 2012 (with 2010 being the only exception).  The attached chart illustrates the trends[38]:

---

[32] *Id.*; *see also* TT 607:23–608:1 (Clarke); JX 14 (Clarke Dep.) at 60 ("I do believe that the home building industry is cyclical and at some point the housing starts would decrease.").

[33] JX 23 (Austin Smith Rebuttal Report) at 6.

[34] JX 267 (Norcraft FY2014 10-K).

[35] JX 20 (Austin Smith Report) at 7.

[36] JX 400 (Norcraft Amendment 5 to Form S-1) at 19.

[37] JX 20 (Austin Smith Report) at 7.

[38] *Id.*

11

| | | Net Sales ($ Millions) | YoY % change | Adjusted EBITDA ($ Millions) | YoY % change |
|---|---|---|---|---|---|
| [1] | 2003 | 256 | | 47 | |
| [2] | 2004 | 330 | 29% | 58 | 23% |
| [3] | 2005 | 405 | 23% | 70 | 21% |
| [4] | 2006 | 441 | 9% | 80 | 14% |
| [5] | 2007 | 394 | -11% | 72 | -10% |
| [6] | 2008 | 332 | -16% | 51 | -29% |
| [7] | 2009 | 247 | -26% | 36 | -29% |
| [8] | 2010 | 263 | 6% | 39 | 8% |
| [9] | 2011 | 269 | 2% | 37 | -5% |
| [10] | 2012 | 289 | 7% | 34 | -8% |
| [11] | 2013 | 340 | 18% | 43 | 26% |
| [12] | 2014 | 376 | 11% | 52 | 21% |

As reflected in the chart, Norcraft LP's adjusted EBITDA trended up in 2013, suggesting that its six-year period of decline had come to an end, at least for the time being.[39]

### 3. Norcraft's IPO and Reorganization

On November 13, 2013, Norcraft completed an initial public offering ("IPO")[40] whereby the Norcraft enterprise was reorganized into the following holding company structure[41]:

---

[39] *Id.* I note that between 2006 and 2013, Norcraft LP's management struggled accurately to project the company's future performance. JX 3 (Buller Dep.) at 183–84.

[40] JX 267 (Norcraft FY2014 10-K) at 12; PTO ¶ 2j.

[41] JX 267 (Norcraft FY2014 10-K) at 12, 15, 65; PTO ¶ 2d.



The newly-formed parent company, Norcraft—a publicly-traded company—was a

holding company; Norcraft Companies LLC ("Norcraft LLC")[42] and its subsidiaries

---

[42] Norcraft LLC is not to be confused with Norcraft Companies, L.L.C. As noted, Norcraft Companies, L.L.C. was converted into Norcraft LP in connection with the 2003 Acquisition, and it continues to exist as such in the Norcraft enterprise structure. JX 400 (Norcraft Amendment 5 to Form S-1) at 19; JX 267 (Norcraft FY2014 10-K) at 12; PTO ¶ 2d.

were the operating entities.[43] Following the reorganization, Norcraft was Norcraft LLC's sole managing member and owned (directly and indirectly) approximately 87.7% of Norcraft LLC, with Buller, his family members and certain members of Norcraft management holding the remainder.[44]

As part of the IPO, Norcraft sold 7,356,634 shares of Norcraft common stock, or 39.1% of Norcraft's equity, to the public at $16.00 per share.[45] SKM and Trimaran together retained a 60.9% equity interest in Norcraft, while Buller, his family members and certain members of Norcraft management, through their convertible Norcraft LLC units, collectively held a prospective 12.3% equity interest.[46]

In conjunction with the IPO, Norcraft entered into Tax Receivable Agreements ("TRAs") with SKM, Trimaran and the Norcraft LLC unitholders (collectively, the "TRA Beneficiaries").[47] Under the TRAs, Norcraft was required

---

[43] JX 267 (Norcraft FY2014 10-K) at 12.

[44] *Id.* PTO ¶ 2d. Buller et al.'s LLC units were convertible "at the option of the [unitholders]" into restricted shares of Norcraft common stock "on a one-for-one basis" or into cash (pursuant to a stated conversion formula), with the form of consideration to be determined at Norcraft's option. JX 267 (Norcraft FY2014 10-K) at 72; *see also* JX 35 (Norcraft Form 424B4, filed Nov. 6, 2013 ["Norcraft IPO Prospectus"]) at 101–02.

[45] JX 35 (Norcraft IPO Prospectus) at 1; PTO ¶ 2d.

[46] JX 35 (Norcraft IPO Prospectus) at 102–03; JX 267 (Norcraft FY2014 10-K) at 73; PTO ¶ 2d.

[47] JX 36 (LLC Unitholder TRA), pmbl.; JX 267 (Norcraft FY2014 10-K) at 79.

14

to pay the TRA Beneficiaries 85% of the applicable annual tax savings, if any, that Norcraft realized as a result of certain tax benefits contributed to Norcraft by the TRA Beneficiaries, including net operating losses and asset basis step-ups.[48] The TRAs also provided that Norcraft's payment obligations to the TRA Beneficiaries would be accelerated in the event of a "Change of Control."[49] The TRAs later came to feature prominently in the Norcraft-Fortune negotiations leading up to the Merger.

## C. Fortune Approaches Norcraft

On October 20, 2014, representatives of Fortune's financial advisor, RBC Capital Markets, LLC ("RBC"), contacted Buller to inform him of Fortune's interest in a potential acquisition of Norcraft.[50] Three days later, Buller met with Fortune's CEO, Christopher Klein, at Fortune's headquarters in Deerfield, Illinois to discuss a potential Norcraft-Fortune transaction.[51] During that meeting, Buller informed Klein that Norcraft was not for sale, but also indicated that he (Buller) would convey

---

[48] JX 36 (LLC Unitholder TRA) §§ 1.1, 3.1 (defining "Realized Tax Benefit" and "Cumulative Net Realized Tax Benefit").

[49] *Id.* §§ 4.1–4.3. The TRAs defined "Change of Control" to include "the acquisition, directly or indirectly, by any [unaffiliated third-party acquiror] . . . of beneficial ownership . . . of more than 50.1% of the aggregate voting power" of Norcraft's outstanding voting stock. *Id.* § 1.1.

[50] PTO ¶ 2k.

[51] PTO ¶ 2l.

15

any acquisition proposal to Norcraft's Board.[52] Perhaps sensing that his Board might be inclined to pursue a deal with Fortune, Buller advised Klein that he would like to have a role in the post-Merger company in the event the parties reached an agreement.[53] Klein was noncommittal but, internally, Fortune was disinclined to bring Buller on board post-Merger.[54] At the meeting's close, Klein provided Buller with a written, non-binding proposal under which Fortune would (1) acquire "100% of [Norcraft's] equity ownership interests" for $22.00 cash per share via a tender offer (followed by a merger); and (2) satisfy Norcraft's obligations under the TRAs.[55]

---

[52] JX 238 (Norcraft Schedule 14D-9, filed Apr. 14, 2015 ["Norcraft Schedule 14D-9"]) at 10.

[53] Transcript of Trial ("TT") at 205:1–10 (Biggart) ("Q. You suspect that Mr. Buller first raised the desire to be employed by Fortune following any merger during a meeting on October 23, 2014. Correct? A. I believe that's when he expressed an interest to [Klein].").

[54] JX 13 (Biggart Dep.) at 86:16–87:18 ("Q. Were there any internal discussions within Fortune about hiring [Buller] post-merger? A. Yes, I talked to [Klein] directly a number of times about it. Q. What did he say? A. [Klein] said I don't know that there is a place for him . . . .").

[55] PTO ¶ 21; JX 69 (Fortune's Oct. 23, 2014 Proposal) at FB0049476. Fortune viewed the TRA payments as part of the Merger consideration. *See* JX 13 (Biggart Dep.) at 34:10–21, 166:10–167:8. Thus, for every dollar spent to satisfy the TRA Beneficiaries, that dollar would not be included in the consideration paid to Norcraft's public stockholders. *See* JX 249 (Funds Flow Memorandum), Ex. E.

16

Buller promptly informed Norcraft's Board of Fortune's proposal, and the Board convened on November 4, 2014 to discuss it.[56] Following that meeting, Norcraft engaged legal and financial advisors to assist the Board in its consideration of Fortune's proposal.[57] The Company retained Ropes & Gray LLP ("Ropes & Gray") as its legal advisor and Citigroup Global Markets Inc. ("Citi") as its financial advisor.[58] The Board promptly tasked Citi with "review[ing] strategic alternatives of the [C]ompany, including a potential sale to Fortune."[59] Norcraft also engaged Pricewaterhouse Coopers ("PwC") to provide an assessment of the Company's contractual obligations under the TRAs.[60]

## D. Norcraft's Management Prepares Long-Term Projections

Norcraft's Board met again on November 8, 2014.[61] During this meeting, "[t]he [B]oard . . . discussed next steps in formulating a potential response to [Fortune], and after discussion, agreed that [Buller, Ginter and Reilly] would map out a proposed strategy and response with Citi[] and report their recommendations

---

[56] JX 238 (Norcraft Schedule 14D-9) at 10.

[57] PTO ¶ 2m; JX 238 (Norcraft Schedule 14D-9) at 10.

[58] PTO ¶ 2m; JX 238 (Norcraft Schedule 14D-9) at 10.

[59] TT 12:1–3 (Eldridge). Nathan Eldridge was Citi's lead banker in connection with the Norcraft engagement. *Id.* at 12:1–15.

[60] PTO ¶ 2m; JX 238 (Norcraft Schedule 14D-9) at 10.

[61] JX 71(Norcraft Board Minutes, Nov. 8, 2014) at NCFT0165019.

17

back to the [B]oard."[62] The Board also instructed Buller and Ginter to prepare five-year financial projections to facilitate the Board's evaluation of strategic alternatives (including a potential Norcraft-Fortune transaction).[63]

Buller and Ginter both had experience preparing long-term projections, having previously prepared five-year projections in connection with Norcraft's IPO and four debt financing transactions between 2003 and 2010.[64] Norcraft, however, did not prepare long-term projections in the ordinary course of its business; it only did so in connection with "extraordinary event[s]" such as financing transactions and ultimately the Merger.[65] Ordinarily, Norcraft management prepared an annual one-year budget, which forecasted Norcraft's quarterly (and monthly) performance for the upcoming year.[66] The Company's annual budgeting process began each fall and involved several steps[67]:

---

[62] *Id.* at NCFT0165020.

[63] JX 1 (Ginter Dep.) at 35–36; *see* JX 3 (Buller Dep.) at 112–16.

[64] JX 1 (Ginter Dep.) at 27–28; JX 3 (Buller Dep.) at 28:21–29:3, 102.

[65] JX 1 (Ginter Dep.) at 27:8–12.

[66] JX 1 (Ginter Dep.) at 22:4–24, 25:3–25; *see* JX 150 (Feb. 27, 2015 e-mail from Tanquist to RBC, attaching Norcraft's FY2015 budget) at NCFT0138021–24.

[67] JX 2 (Tanquist Dep.) at 25–27; JX 3 (Buller Dep.) at 24:8–26:1.

■ First, the corporate controller for each of Norcraft's four business divisions would prepare a detailed "bottoms-up" budget for his or her division.[68] As part of that process, the division controllers "would work with [their respective] division presidents to come up with what they expected for sales growth in the [upcoming] year and . . . would build that into the budget[,] [along with] . . . other assumptions like labor efficiencies [and] material cost."[69] In this way, the division controllers "would get a picture of what [profit and loss] would look like for [their respective divisions for] the [upcoming] year."[70]

■ Next, each division controller would present his or her division-level budget to Buller and Ginter "for review and approval."[71]

■ Finally, "[a]fter several rounds of . . . back-and-forth," Ginter would compile the division-level budgets "into a consolidated format," which was then presented to the Board for review and approval in January of the budgeted year.[72] After review, the Board typically would approve the consolidated annual budget that same month.[73]

Following the Board's November 8, 2014 meeting, Buller and Ginter created two sets of five-year projections: a base-case projection (the "Base Case") and an upside-case projection (the "Upside Case"), both of which are summarized below.[74]

---

[68] JX 1 (Ginter Dep.) at 22:9–12; JX 2 (Tanquist Dep.) at 25:12–24.

[69] JX 2 (Tanquist Dep.) at 25:25–26:5.

[70] *Id.* at 26:5–7.

[71] JX 1 (Ginter Dep.) at 22:11–14; JX 3 (Buller Dep.) at 24:8–25:1.

[72] JX 1 (Ginter Dep.) at 22:15–18; JX 2 (Tanquist Dep.) at 26:8–10; JX 3 (Buller Dep.) at 24:12–18.

[73] JX 2 (Tanquist Dep.) at 26:8–10; JX 3 (Buller Dep.) at 24:15–18.

[74] JX 1 (Ginter Dep.) at 74–80; JX 99 (Jan. 9, 2015 e-mail from Reilly to other Norcraft Board members, attaching Norcraft management presentation ["Norcraft Jan. 2015 Management Presentation"]) at NCFT0146344–47. The record also contains a set of three-

19

| Base Case Projections (FY2014–2019)[75] | | | | | | |
|---|---|---|---|---|---|---|
| ($ in millions) | 2014E | 2015E | 2016E | 2017E | 2018E | 2019E |
| Net Sales | $371 | $409 | $448 | $483 | $523 | $568 |
| EBITDA | $51 | $59 | $70 | $79 | $89 | $100 |
| EBIT | $36 | $42 | $51 | $58 | $68 | $81 |
| CapEx | $10 | $18 | $12 | $15 | $16 | $17 |

| Upside Case Projections (FY2014–2019)[76] | | | | | | |
|---|---|---|---|---|---|---|
| ($ in millions) | 2014E | 2015E | 2016E | 2017E | 2018E | 2019E |
| Net Sales | $373 | $415 | $460 | $507 | $558 | $613 |
| EBITDA | $51 | $61 | $75 | $89 | $105 | $120 |
| EBIT | $36 | $45 | $56 | $67 | $82 | $100 |
| CapEx | $10 | $18 | $12 | $15 | $17 | $18 |

year projections for Norcraft, apparently created by Ginter prior to October 2014 (the "Ginter 2014 Projections"). Ginter, however, did not recall creating these projections or the purpose for which they were prepared. *See* JX 1 (Ginter Dep.) at 35:23–36:4, 53:22–54:18.

[75] JX 99 ("Norcraft Jan. 2015 Management Presentation") at NCFT0146344–47.

[76] *Id.* The Base Case and Upside Case projections also included free cash flow forecasts. *Id.* at NCFT0146347. Those free cash flow forecasts, however, did not deduct for income taxes and, therefore, significantly overstated Norcraft's future free cash flows. JX 1 (Ginter Dep.) at 44–45. Accordingly, the tables depicted here do not include the free cash flow component of the Base Case and Upside Case projections.

In preparing the Base Case and Upside Case projections, Buller and Ginter took a "top-down" approach—independently projecting Norcraft's net sales, operating expenses and capital expenditures (for all business divisions) in the first instance, and then consulting with division-level management as and where needed—rather than the "bottoms-up" approach they used to prepare Norcraft's annual budgets.[77] They created the Upside Case first.[78] After preparing the Upside Case, Buller and Ginter presented it to Reilly for his review.[79] "Upon review, [Reilly opined] that the [Upside Case] . . . was too aggressive . . . and asked [Buller and Ginter] to go back and . . . do a more conservative model, which became known as the [B]ase [C]ase."[80] Buller and Ginter both believed that Norcraft could achieve the results forecasted in the Base Case and Upside Case projections, although "the [U]pside [C]ase was more of a stretch and everything would have had to go right."[81]

---

[77] JX 1 (Ginter Dep.) at 22–23, 75–76, 87–88; JX 3 (Buller Dep.) at 34–36.

[78] JX 1 (Ginter Dep.) at 75–76.

[79] *Id.*

[80] *Id.* at 75:23–76:8.

[81] *Id.* at 97:12–13; JX 3 (Buller Dep.) at 115:8–18 ("The [B]ase [C]ase is something that we felt very, very comfortable in doing, and then [in the Upside Case] we showed the upside that if everything, everything went our way, there was a possibility that we could hit the [U]pside [Case].").

Buller and Ginter presented the Base Case and Upside Case projections to Norcraft's Board at a meeting on November 25, 2014.[82] After discussion, the Board approved both sets of projections for use in connection with the Board's consideration of Fortune's proposal.[83]

## E. Norcraft Pushes Fortune to Increase its Offer

Norcraft's Board next met on December 3, 2014.[84] During this meeting, Citi presented the Board with an analysis of Norcraft's standalone prospects and possible strategic alternatives.[85] Citi's presentation included an overview of preliminary valuation perspectives and selected strategic alternatives,[86] "including maintaining the status quo, a possible sale of the Company to [Fortune] or another buyer, as well as some other potential acquisition targets."[87] Following Citi's presentation, the Board determined that (1) "[Fortune's] proposed price of $22.00 per share was inadequate"; and (2) "[Fortune's] offer would need to be significantly and

---

[82] JX 71 (Norcraft Board Minutes, Nov. 25, 2014) at NCFT0165023.

[83] *Id.*; PTO ¶ 2o.

[84] JX 71 (Norcraft Board Minutes, Dec. 3, 2014) at NCFT0165024.

[85] *Id.* at NCFT0165025; JX 95 (Dec. 2, 2014 email from Reilly to other Norcraft Board members attaching Citi presentation deck).

[86] JX 95 (Dec. 2, 2014 email from Reilly to other Norcraft Board members attaching Citi presentation deck).

[87] JX 71 (Norcraft Board Minutes, Dec. 3, 2014) at NCFT0165025.

substantially higher in order for the Board to consider a potential sale of the Company at this time."[88] The Board, however, did not task Citi with pursuing alternative buyers or canvassing the market.

Two days later, Buller called Klein and conveyed to him the Board's determination.[89] Buller also explained that "if [Fortune] were interested in significantly increasing [its proposed price] . . . , [Norcraft] would be prepared to share certain [non-public] information [with Fortune], under a confidentiality agreement with an appropriate standstill, in order to assist [Fortune] in understanding [Norcraft's] prospects, upside potential and intrinsic value."[90] Soon thereafter, on December 11, 2014, Norcraft and Fortune entered into a confidentiality agreement with a standstill.[91]

On January 7, 2015, Buller, Ginter and Citi representatives met with Fortune's management at Buller's home in Winnipeg, Canada to discuss the proposed Norcraft-Fortune transaction.[92] The discussion focused on the structure and timing of the proposed transaction, Norcraft's business and financial projections and the

---

[88] *Id.*

[89] JX 238 (Norcraft Schedule 14D-9) at 11.

[90] *Id.*

[91] PTO ¶ 2p; JX 97 (Confidentiality Agreement).

[92] PTO ¶ 2q.

integration of Norcraft into Fortune.[93] Norcraft provided Fortune with the Base Case and Upside Case projections as well as certain preliminary information regarding the TRAs.[94] During this meeting, Buller reiterated his interest in post-closing employment with Fortune and discussed the possibility with Klein.[95] Again, Klein "ke[pt] the door open" but stopped short of making a commitment.[96]

The following week, on January 14, Norcraft's tax advisor, PwC, presented its analysis regarding the TRAs to Fortune's management and RBC.[97] PwC explained that termination of the TRAs in connection with Fortune's acquisition of Norcraft would require significant payments to the TRA Beneficiaries (including Buller).[98] PwC also identified certain tax benefits that Fortune could realize from the acquisition, including a stepped-up basis in Norcraft's assets.[99] The next day, Klein advised Buller that Fortune's tax advisor was performing its own analysis of

---

[93] *Id.*

[94] *Id.*

[95] JX 238 (Norcraft Schedule 14D-9) at 12.

[96] JX 13 (Biggart Dep.) at 88:2–3.

[97] PTO ¶ 2r.

[98] *Id.*; JX 238 (Norcraft Schedule 14D-9) at 12. All parties agreed that Fortune's acquisition, directly or indirectly, of 100% of Norcraft's equity would constitute a "Change of Control" within the meaning of the TRAs. JX 36 (LLC Unitholder TRA) § 1.1 (defining "Change of Control"); *see* PTO ¶ 2z.

[99] PTO ¶ 2r.

24

Norcraft's obligations under the TRAs following the proposed transaction.[100] Klein also noted that Fortune would require more information about the TRAs to calculate Fortune's full payment obligations to the TRA Beneficiaries.[101]

On January 27, 2015, Klein delivered to Buller a revised written indication of interest with a proposed price of $25.00 per share.[102] Buller promptly informed Norcraft's Board of Fortune's revised proposal, and the Board met on February 2 to discuss it.[103] During this meeting, Citi provided the Board with its revised valuation analysis, which incorporated Norcraft's net sales and EBITDA results for Q4 FY2014 (both of which were higher than expected) and Fortune's latest proposal of $25.00 per share.[104] Reilly then reviewed with the Board the tax benefits that Fortune would realize in connection with its proposed acquisition of Norcraft, including a stepped-up basis in Norcraft's assets.[105] After receiving Reilly's report,

---

[100] PTO ¶ 2s.

[101] Id.

[102] JX 238 (Norcraft Schedule 14D-9) at 12.

[103] See JX 238 (Norcraft Schedule 14D-9) at 12; JX 71 (Norcraft Board Minutes, Feb. 2, 2015) at NCFT0165026–27.

[104] JX 238 (Norcraft Schedule 14D-9) at 12; see JX 71 (Norcraft Board Minutes, Feb. 2, 2015) at NCFT0165026–27; PTO ¶ 2t. Citi's valuation employed several methodologies, including a DCF and comparable company analysis, and yielded values of $16.75 to $27 per share (based on the Base Case projections). JX 115 (Feb. 2, 2015 email from Citi, attaching Board Discussion Materials) at CITI-00063489.

[105] JX 71 (Norcraft Board Minutes, Feb. 2, 2015) at NCFT0165027.

"the Board concluded that [Fortune] would benefit from th[at] step-up in basis going forward and should therefore value th[at] benefit in its offer price."[106]

With Citi's and Reilly's input in hand, the Board determined that Fortune's proposed purchase price of $25.00 per share was inadequate, in part because it did not value the tax benefits that Fortune would realize in connection with the proposed transaction.[107] The Board also believed, however, "that a transaction with [Fortune] could potentially create more value for [Norcraft] stockholders if at an appropriate valuation than if [Norcraft] continued independently to execute on its strategic plan. Accordingly, the Board authorized [Buller and Reilly] to continue to engage in discussions with [Fortune] to confirm if [Fortune] was willing to further increase its propos[ed] [price]."[108] Even at this stage, however, the Board did not reach out to other potentially interested parties in hopes of securing a better offer or, at least, a source of leverage in its discussions with Fortune.

The next day, Buller called Klein to convey Norcraft's position regarding Fortune's revised proposal.[109] During that call, Buller advised Klein that Fortune's

---

[106] *Id.*

[107] JX 238 (Norcraft Schedule 14D-9) at 12.

[108] *Id.*

[109] *Id.*

proposed price remained inadequate and encouraged Fortune to increase its bid.[110]

Unable to invoke the threat of an alternative transaction, Buller highlighted Norcraft's better than expected preliminary FY2014 results and FY2015 outlook as support for his pitch that Fortune pay a higher price.[111] Apparently not feeling the heat, Klein advised Buller that Fortune would consider increasing its bid but that it was unlikely that Fortune's proposed price would move significantly higher than $25.00 per share.[112]

Following Buller and Klein's February 3 call, Fortune increased its offer to $25.50 per share, indicating that this was its "best and final offer."[113] The Norcraft team was less than thrilled with Fortune's $25.50 per share proposal; indeed, Reilly and Ginter both believed that Fortune's proposal significantly undervalued Norcraft.[114] Nevertheless, the Board remained focused exclusively on Fortune. In a last- ditch effort to get Fortune to increase its "best and final offer," the Board

---

[110] *Id.*

[111] *Id.*; PTO ¶ 2u.

[112] JX 238 (Norcraft Schedule 14D-9) at 12.

[113] JX 412 (Feb. 10, 2015 email from Klein to Buller, attaching Fortune's re-revised proposal) at 2.

[114] JX 1 (Ginter Dep.) at 231:21–24 ("Q: [Y]ou testified that you thought that Norcraft was undervalued in the transaction [with Fortune], right? A: Yes."); JX 140 (Feb. 20, 2015 email from Reilly to Buller, Maselli and Citi representatives in which Reilly opines that "[Norcraft was] leaving $ on the table" by moving forward with Fortune's $25.50 per share proposal).

27

responded with a counterproposal of $27.50 per share.[115] When Fortune rejected that counterproposal, the Board bid against itself with a second counterproposal of $26.25 per share.[116] Once again, Fortune held firm and reiterated that $25.50 per share was its best and final offer[117]—well aware that it was getting the Company for a "good price."[118] With no alternative transaction on the horizon, Norcraft's Board capitulated on February 21 at $25.50 per share, hoping to extract further value during a post-sign go-shop.[119]

---

[115] JX 412 (Feb. 10, 2015 email from Fortune to Buller attaching letter rejecting counterproposal).

[116] JX 413 (email chain Klein to RBC and Fortune deal team describing counterproposal, Feb. 13, 2015) at FB0089263.

[117] TT 100:4–17 (Biggart); JX 238 (Norcraft Schedule 14D-9) at 13.

[118] JX 185 (Mar. 20, 2015 email from Klein to Fortune director Mackay) ("You are spot on – its [sic] a good price, and there is a risk someone comes along and tries to top the offer."). Indeed, prior to signing the Merger Agreement, Fortune had RBC render a fairness opinion. In that regard, RBC conducted a standalone DCF analysis of Norcraft that valued Norcraft at $30.26 per share. JX 216 (Mar. 29, 2015 RBC presentation slides) at FB0047801. Fortune's management valued Norcraft even higher. Its discounted cash flow and internal rate of return ("IRR") analysis (the "DCF/IRR Analysis") of Norcraft as a standalone entity valued Norcraft at approximately double the Merger Price and estimated a 16% annualized IRR before accounting for synergies. JX 191 (slides from Mar. 29, 2015 Fortune board meeting regarding Norcraft acquisition) at FB0076961; JX 301 (Apr. 28, 2015 email between Fortune deal team members, attaching Fortune valuation of Norcraft dated Mar. 19, 2015).

[119] JX 238 (Norcraft Schedule 14D-9) at 14; see TT 13–15 (Eldridge); JX 3 (Buller Dep.) at 86:13–20.

28

## F. The Parties Negotiate the Merger Agreement

In late February 2015, Citi informed Fortune that Norcraft was prepared to move forward with Fortune's $25.50 per share proposal, subject to the negotiation of a merger agreement that included a forty-five-day post-signing go-shop right for Norcraft.[120] Fortune responded with a counterproposal that provided for a twenty-five-day post-signing go-shop "that would be limited to certain identified potential purchasers."[121] The counterproposal also called for a $15 million termination fee if Norcraft accepted a superior proposal received during the go-shop period and a $25 million termination fee otherwise.[122] By proposing this structure, Fortune sought to give Norcraft's Board "the minimum amount [of time it] needed to satisfy [its] fiduciary responsibility . . . and no more,"[123] while also "discourag[ing] potential bidders."[124]

On February 27, following negotiations, the parties eventually settled on a thirty-five day post-signing go-shop period (the "Go-Shop Period") with no

---

[120] JX 238 (Norcraft Schedule 14D-9) at 13–14. Norcraft also sought Fortune's confirmation that (1) it would allow enhanced severance for Norcraft's outgoing senior management; and (2) the TRA payment obligations would be satisfied in full at closing. *Id.* at 14.

[121] *Id.*

[122] *Id.*

[123] JX 5 (Klein Dep.) at 164:20–165:4.

[124] JX 12 (Baab Dep.) at 99:23–100:4.

restrictions on the parties Norcraft or its advisors could contact, a $10 million termination fee if Norcraft accepted a superior proposal during the Go-Shop Period and a $20 million termination fee otherwise.[125] Importantly, however, Fortune also secured information rights with respect to competing proposals and unlimited matching rights with respect to superior proposals.[126] In a final stroke of masterful bargaining, Fortune also secured the right to launch Tahiti's tender offer for all of Norcraft's outstanding common stock (at $25.50 per share) fifteen days after the start of the Go-Shop Period.[127]

In early March 2015, Fortune was given access to Norcraft's electronic data room, and on March 4, Fortune and Norcraft entered into a thirty-day exclusivity

---

[125] JX 238 (Norcraft Schedule 14D-9) at 13–14; JX 221 (Merger Agreement) §§ 5.4, 7.3(a)(ii), 8.2. The Merger Agreement defined a "superior proposal" as "a bona fide written Competing Proposal (with all percentages in the definition of Competing Proposal increased to fifty percent (50%)) that did not arise out of a breach of Section 5.4 made by a Third Party on terms that the board of directors of the Company determines in good faith, after consultation with the Company's financial and legal advisors, and considering all factors as the board of directors of the Company (in consultation with its financial and legal advisors) considers to be appropriate (including financing risk, regulatory approval risk, the conditionality, timing and likelihood of consummation of such proposal and the experience and reputation of the proposed buyer) to be more favorable to the stockholders of the Company from a financial point of view than the Offer and the other Transactions (after giving effect to all adjustments to the terms thereof which may be offered by [Fortune] in writing, including pursuant to Section 5.4(g))." JX 221 (Merger Agreement) § 8.2 (defining "Superior Proposal").

[126] JX 221 (Merger Agreement) § 5.4(c), (g). Under the Merger Agreement, Fortune had four business days to match a superior proposal by a third-party bidder and two business days to match any subsequent proposal by the same bidder. Id. § 5.4(g).

[127] Id., pmbl. & § 1.1

agreement.[128]  Thereafter, on March 13, Buller, Ginter and Tanquist met with Fortune management to provide additional non-public information about Norcraft, and, on March 18, Fortune met with the senior management of each Norcraft business division. [129]

With the Merger Price set, and negotiations between Norcraft and Fortune proceeding apace, Buller again approached Klein about post-Merger employment with Fortune.  At a Fortune-initiated meeting with Norcraft management on March 6, Buller advised Klein that he wanted to head Norcraft and Fortune's combined cabinetry business post-acquisition.[130]  With the price locked in, and the inevitably uncomfortable confrontation now unavoidable, Klein finally informed Buller that Fortune would have no place for him after the Merger.[131]  This came as a shock to Buller, who thereafter became increasingly "disruptive."[132]

---

[128] JX 238 (Norcraft Schedule 14D-9) at 14; PTO ¶ 2w.

[129] JX 238 (Norcraft Schedule 14D-9) at 15.

[130] JX 163 (e-mail chain between Klein and RBC, Mar. 11, 2015) (Klein: "At one point [Buller] said in a hopeful way – 'Do you want to hire me to run your whole cabinet business?' I gently said no . . . . "); JX 13 (Biggart Dep.) at 86:16–87:11 (explaining that Buller "was hoping that [Fortune would] hire him").

[131] JX 163 (e-mail chain between Klein and RBC, Mar. 11, 2015); TT 205:7–14 (Biggart) (On March 6, 2015, Fortune "definitively told [Buller] he didn't have the job."); *see also id.* 83:1–3 (Biggart).

[132] TT 205:19 (Biggart); *see* JX 163 (e-mail chain between Klein and RBC, Mar. 11, 2015) (Klein: "From that point forward [Buller] was rather short with me . . . . So I need some help here - in a very careful way, so as not to turn this into WWIII. [Buller] and his ego need to [be] managed."); TT 127:11–17 (Biggart) ("Buller, at this point, is not supporting

Unable to abandon the enterprise completely, Buller soon returned to Fortune with a new proposal: if he would not be a part of the combined company, then, upon Fortune's acquisition of Norcraft, Buller would acquire Urban Effects (Norcraft Canada) from Fortune.[133] After Buller announced his interest in acquiring Norcraft Canada, the Board determined, for the first time, that Buller was conflicted and, therefore, should be excluded from Board deliberations regarding the potential Norcraft-Fortune transaction.[134]

Buller, for his part, was determined to acquire Urban Effects and continued to press Fortune for a commitment to sell him the business, while also continuing to

the transaction, and [Fortune was] getting the sense that he's not going to sign the merger agreement. And I'm concerned.").

[133] JX 13 (Biggart Dep.) at 95:12–17 ("Q. Was it your understanding that Mr. Buller first raised his desire to purchase Norcraft Canada . . . after he was told there's no place for you post-closing? A. I believe so, that was the first I heard about it."); JX 168 (e-mail chain between Klein and Fortune deal team, Mar. 14, 2015) (Klein: "So, I spoke to [Buller] this morning, and he would like to buy Urban Effects."); JX 11 (Reilly Dep.) at 156:3–9.

[134] JX 71 (Norcraft Board Minutes Mar. 19, 2015) at NCFT0165034–35. According to Buller, since he never engaged in pre-close negotiations with Fortune to acquire Norcraft Canada, he did not recuse himself from Norcraft-Fortune negotiations. JX 3 (Buller Dep.) at 235:12–240:20. In contrast, Reilly testified that Buller did recuse himself from certain Norcraft Board meetings. JX 11 (Reilly Dep.) at 158:11–24. Remarkably, the Norcraft Canada conflict was the first Buller conflict that seemed to percolate up to the Board's attention. As discussed below, the Board apparently was content to have Buller negotiate TRA payments and Merger consideration at the same time (even though the TRA payments were to be made only to select TRA Beneficiaries who were competing with Norcraft stockholders for consideration), and also content to have Buller negotiate for his own post-Merger employment with Fortune while simultaneously taking the lead for Norcraft in Merger negotiations. See JX 13 (Biggart Dep.) at 89:7–11; JX 5 (Klein Dep.) at 139:3–140:14.

lead Norcraft's negotiations with Fortune.[135] Fortune, however, was unwilling to give such a commitment while negotiations with Norcraft were ongoing—much to Buller's frustration.[136] Yet it soon became clear to Fortune that Buller's ire now risked derailing the deal.[137] To keep the peace, on March 25, Reilly emailed Buller to advise him that "[Klein] is going to offer to provide you some meaningful comfort on [C]anada. . . ."[138] Klein's overture to Buller accomplished its intended purpose; Buller felt he had "[g]ot[ten] good comfort on UE."[139] This "comfort" included:

---

[135] *See* JX 13 (Biggart Dep.) at 97–100; *id.* at 121:4–10 ("[Q.] As of Thursday, March 19th, was [it] your understanding that Mr. Buller was insisting on some understanding pre-signing with respect to the sale to him of the Canada business? A. That's my understanding. I believe [Buller] continued this up right until we signed the [Merger Agreement]."); TT 125:3–21 (Biggart) (explaining that Buller was upset because Fortune would not commit to sell him Norcraft Canada).

[136] *See* JX 168 (e-mail chain between Klein and Fortune deal team, Mar. 14, 2015) (Klein: "I told [Buller that his proposed acquisition of Urban Effects] would likely be a subsequent transaction - a week later or something like that, post close."); JX 195 (e-mail chain between Klein and Fortune deal team, Mar. 25, 2015) (Klein: "[Eldridge] said I need to call [Buller] and calm him down and make him feel good"); TT 114–15 (Biggart) (explaining that Fortune did not feel comfortable negotiating a Norcraft Canada transaction with Buller pre-closing).

[137] JX 195 (e-mail chain between Klein and Fortune deal team, Mar. 25, 2015) (Klein: "[Eldridge] said I need to call [Buller] and calm him down and make him feel good.").

[138] JX 197 (e-mail chain between Buller and Reilly, Mar. 26, 2015).

[139] JX 202 (e-mail from Buller to PwC, Mar. 27, 2015).

33

- Fortune's waiver of a two-year, Canada-specific non-compete covenant otherwise applicable to Buller[140]; *and*

- Fortune's agreement to modify Buller's employment agreement with Norcraft's operating subsidiary to provide that Buller would receive a severance payment if his employment was terminated without cause (including by Buller himself) within twelve months of Fortune's acquisition of Norcraft.[141]

Thereafter, it appears that Buller was content to "live with a trust me I will sell Canada to you" status quo, and ostensibly was willing to support the Norcraft-Fortune transaction again—to Fortune's great relief.[142]

With the Norcraft Canada fire contained, Fortune was soon on to the next Buller-related fire. In late March 2015, having finalized most of the merger agreement's material terms, Norcraft and Fortune found themselves unable to reach agreement on the termination payments that would be due to the TRA Beneficiaries holding Norcraft LLC units (including Buller and his family members).[143]

---

[140] JX 198 (e-mail chain between Norcraft and Fortune deal teams, Mar. 26, 2015) at NCFT0168392; TT 126:6–16 (Biggart) ("I got Chris Klein to agree . . . that [Fortune] would waive [Buller's] noncompete in Canada, as a showing of good faith to . . . Buller that we were serious when we say we're going to . . . have a negotiation after the closing . . . .").

[141] JX 219 (Amendment to Buller's Employment Agreement).

[142] JX 204 (e-mail from Reilly to Maselli, Mar. 27, 2015).

[143] TT 123–26 (Biggart) (explaining the TRA-related difficulties); *id.* at 126:2–5 (Biggart) ("I called [Ropes & Gray] and said . . . [w]e better do something quick or this whole deal is going to fall apart.").

Norcraft's and Fortune's tax advisors disagreed as to the value of certain tax attributes associated with the Norcraft LLC units, resulting in a $3 million difference in their respective calculations of the termination payments.[144]

On March 26, Fortune tried to "cut a deal with Buller" on the TRA termination payments by offering to pay $2 million of the $3 million difference.[145] Buller insisted, however, that Fortune pay the entire $3 million, much to Fortune's exasperation.[146] At this point, Fortune seemingly had reached its limit with Buller and advised Citi that "if there [was] no signed [merger] agreement by [the morning of March 30, Fortune was] done."[147] Negotiations followed. Ultimately, to appease Buller and keep the deal on track, SKM and Trimaran offered to transfer $1 million of the TRA termination payments they stood to receive to the Norcraft LLC unitholders, such that the unitholders would receive the full $3 million demanded by

---

[144] TT 123–24 (Biggart).

[145] JX 13 (Biggart Dep.) at 168:2–3; JX 198 (e-mail chain between Norcraft and Fortune deal teams, Mar. 26, 2015); JX 207 (e-mail from Klein to Fortune deal team, Mar. 27, 2015); TT 126:8 (Biggart) ("[Fortune was] willing to pay 2 out of the $3 million.").

[146] JX 207 (e-mail from Klein to Fortune deal team, Mar. 27, 2015) (Klein: "We[] heard through [Buller's] personal lawyer that he rejects our offer of 2 of 3 million [of the] disputed TRA amount, needs all 3. . . . I've been very reasonable here in all of this, but really cannot go any farther. I do not wish to call [Buller] and go through all of this again with him - it could do more harm than good.") (formatting altered); TT 128:12–23 (Biggart) ("Q. What was [Buller's] response to that proposal? A. He said no. And he said, I want . . . everything that my accountant says I'm entitled to. He said, [my accountant] has calculated my TRA payment at 19.7 [million], I want 19.7.").

[147] JX 207 (e-mail from Klein to Fortune deal team, Mar. 27, 2015).

35

Buller.[148] With that, the TRA fire was extinguished and Fortune had no more Buller-related fires to fight.

## G. Norcraft's Board Approves the Merger and Norcraft Executes the Merger Agreement

On March 29, 2015, Norcraft's Board received Citi's fairness opinion and approved the Merger Agreement.[149] The following day, Norcraft and Fortune executed the Merger Agreement and issued a press release announcing the Merger.[150] Immediately following the execution of the Merger Agreement, Norcraft entered into TRA termination agreements with the TRA Beneficiaries—SKM, Trimaran and the Norcraft LLC unitholders—providing that the TRAs would be terminated (if the Merger was consummated) in exchange for $43.5 million in total payments to the TRA Beneficiaries.[151]

---

[148] JX 212 (Mar. 27, 2015 e-mail from Buller to Maselli, Reilly et al., thanking Maselli and Reilly for agreeing that Trimaran and SKM, respectively, would transfer the $1 million sum to the Norcraft LLC unitholders); TT 129:6–24 (Biggart).

[149] JX 238 (Norcraft Schedule 14D-9) at 16–17.

[150] PTO ¶ 2y; JX 238 (Norcraft Schedule 14D-9) at 17.

[151] PTO ¶ 2z. Under the TRA termination agreements, the Norcraft LLC unitholders would receive approximately $19.7 million, SKM would receive approximately $15.9 million and Trimaran would receive approximately $7.9 million. *Id.*

36

SKM, Trimaran and the Norcraft LLC unitholders also entered into Tender and Support Agreements ("TSAs") with Fortune and Tahiti,[152] whereby SKM, Trimaran and the Norcraft LLC unitholders agreed that:

- they would "promptly" tender their Norcraft shares into Tahiti's tender offer and, in any event, would do so at least two days before the offer's initial expiration date[153]; *and*

- the shares so tendered could not be withdrawn unless and until the tender offer expired or was "terminated in accordance with the terms of Merger Agreement."[154]

## H. The Go-Shop

The Go-Shop Period commenced with the Merger's announcement on March 30, 2015.[155] Given that Norcraft and Citi had focused exclusively on Fortune during the pre-sign "process," it was especially important that the Company run an effective go-shop to provide a meaningful market check. Yet Citi's lead banker, Eldridge, had never run a sell-side go-shop.[156] Because Norcraft's Board was unsure

---

[152] PTO ¶ 2bb.

[153] JX 229 (Buller Tender and Support Agreement ["Buller TSA"]) § 3; JX 230 (SKM Tender and Support Agreement ["SKM TSA"]) § 3; JX 231 (Trimaran Tender and Support Agreement ["Trimaran TSA"]) § 3. Fortune initiated Tahiti's tender offer on April 14, 2015, PTO ¶ 2ee, and the offer's initial expiration date was May 11, 2015. JX 239 (Norcraft Schedule TO, filed Apr. 14, 2015, attaching Tahiti's tender offer) at 9.

[154] JX 229 (Buller TSA) § 3(b); JX 230 (SKM TSA) § 3(b); JX 231 (Trimaran TSA) § 3(b).

[155] PTO ¶ 2cc.

[156] TT 45:14–46:8 (Eldridge); JX 8 (Eldridge Dep.) at 49:8–12, 89:17–90:22.

37

of the go-shop's core components, it relied completely on Citi to oversee the process.[157] Fortune, on the other hand, knew full well what was at stake. Its Vice President of M&A, Robert Baab, pushed hard for an unlimited match right and for Fortune's right to launch Tahiti's tender offer during the Go-Shop Period, understanding that both measures would make it less likely that a topping bidder would emerge.[158]

During the Go-Shop Period, Citi contacted fifty-four potential bidders: twelve potential "strategic" bidders and forty-two private equity firms.[159] Of the fifty-four parties contacted, seven entered into nondisclosure agreements—six private equity firms and American Woodmark, one of Norcraft's industry peers.[160] Only one of

---

[157] JX 3 (Buller Dep.) at 199–200; JX 9 (Maselli Dep.) at 76:5–16; JX 11 (Reilly Dep.) at 122–29.

[158] JX 12 (Baab Dep.) at 100–02; *see also* JX 149 (Feb. 27, 2015 email from Klein to Fortune deal team outlining Fortune's conditions for the go-shop, explaining their intended effect of avoiding an auction); JX 232 (e-mail chain between RBC, Klein and other members of Fortune's deal team, Apr. 7, 2015, explaining RBC should emphasize to other potential buyers that Fortune has matching rights).

[159] TT 26:22–27:1 (Eldridge). Citi's contact list was developed with input from Buller and Reilly, who "suggested [certain] companies to put on the list, including companies that had reached out to [Norcraft] historically." TT 27:7–12 (Eldridge).

[160] TT 27 (Eldridge); JX 243 ("Buyers Log" dated May 4, 2015, prepared by Citi ["Citi Go-Shop Log"]). The six private equity firms were The Carlyle Group ("Carlyle"), TPG Capital, Wind Point Partners, Olympus Partners, American Industrial Partners and another unidentified private equity firm. TT 27 (Eldridge); JX 243 (Citi Go-Shop Log).

those seven parties, Carlyle, went on to meet with Norcraft management.[161] Carlyle ultimately did not submit a bid.[162]

Most of the parties Citi contacted indicated either that they were "not interested in competing with Fortune"[163] or that "[t]he price [was] too high."[164] At least two non-bidding parties, however, advised Citi that they could not "move fast enough [to submit a bid] in 35 days."[165]

In an effort to ensure that Fortune would reap the benefits of its hard-fought bargain, RBC and Klein devised a strategy to dissuade potentially interested parties from engaging with Norcraft. In that connection, early in the go-shop process, RBC emailed Klein advising that RBC had "a call scheduled for [April 9, 2015] with

---

[161] JX 240 ("Go-Shop Process Update" dated Apr. 20, 2015, prepared by Citi); TT 157 (Biggart).

[162] PTO ¶ 2cc.

[163] JX 243 (Citi Go-Shop Log) at 5 ("no interest in going head-to-head with Fortune on this"), 7 ("Fortune is a logical buyer here, so hard for us to compete"), 8 ("[n]ot that interested in competing against Fortune"), 10 ("[c]an't compete with Fortune"), 11 ("[c]an't compete with Fortune").

[164] *Id.* at 6, 14 ("[v]alue too high").

[165] *Id.* at 15; *see id.* at 2 ("investment is too big [] to consider in a short period"); TT 46:9–19 (Eldridge) ("Q. And, sir, you testified at your deposition that there were go-shop participants in this process who indicated that they would like to have more time. Correct? A. Yes. Q. And what parties were those? A. I don't recall specifically. I recall it being a general comment from a couple of people that we spoke with. They may not have been people that signed NDAs. It was just a general comment from various people that we contacted.").

Masco"—one of the go-shop participants—"to discuss the [Merger]."[166]  In this email, RBC explained that it would "emphasize [to Masco] that [Norcraft] is an asset that [Fortune has] been monitoring/targeting for a long time . . . and [that Fortune] view[ed] the [Merger] as highly strategic."[167]  RBC also indicated that it hoped to "get some sense from Masco as to whether or not [Masco was] likely to engage [with Norcraft]."[168]  Eager to close the deal, Klein advised RBC that "[t]he trick [with Masco] . . . is not to make Norcraft sound very interesting for them."[169]  Klein also emphasized that he was "more interested in [RBC] shutting the door on [Masco] and [its] willingness to look at [acquiring Norcraft], versus learning a lot from [Masco] . . . ."[170]

When Fortune's general counsel, Biggart, learned of this correspondence, he nearly had "a heart attack in [his] office."[171]  He immediately "went over to see [Klein]"—before RBC's call with Masco—and "explained to him that [Fortune and

---

[166] JX 233 (e-mail chain between Klein, RBC and other members of Fortune's deal team, Apr. 7, 2015) at FB0089016.

[167] Id.

[168] Id.

[169] Id.

[170] Id.

[171] TT 144:3–4 (Biggart).

40

its deal team] can't be doing this."[172] Biggart then warned RBC that Klein's proposed approach was "the wrong way to deal with a go-shop" and that "[RBC] can't be interfering like this."[173] Klein apparently heeded Biggart's admonition, as did RBC.[174]

As permitted by the Merger Agreement, Fortune launched Tahiti's tender offer for Norcraft's stock fifteen days into the Go-Shop Period, on April 14, 2015, securing the support of a majority of Norcraft's outstanding common stock (per the TSAs).[175] The Go-Shop Period expired as scheduled on May 4, with Norcraft having received no competing acquisition proposals.[176] Tahiti successfully completed its tender offer on May 11, and the Merger closed the following day.[177]

## I. The Parties' Experts

Both parties presented valuation experts at trial to opine on Norcraft's fair value as of the Merger date.[178] Petitioners' valuation expert was David A. Clarke;

---

[172] TT 144:5–6 (Biggart).

[173] TT 144:16–18 (Biggart).

[174] JX 5 (Klein Dep.) at 275:6–276:14.

[175] JX 221 (Merger Agreement), pmbl. & § 1.1; PTO ¶¶ 2cc, 2ee.

[176] PTO ¶ 2cc.

[177] JX 250 (May 12, 2015 Fortune press release); PTO ¶ 2ff.

[178] TT 455–56 (Clarke); TT 698 (Austin Smith).

Respondent presented Yvette R. Austin Smith.[179]  Petitioners also presented a deal

process expert, Guhan Subramanian ("Subramanian"), to opine on the soundness (or

not) of Norcraft's deal process.[180]  I summarize each expert's opinion below.

### 1. Clarke's Opinion Regarding Norcraft's Fair Value

Clarke opined that the Merger Price of $25.50 per share "does not reflect

Norcraft's fair value [as of the Merger date] . . . [b]ecause there was no competitive

process to acquire Norcraft prior to the signing of the Merger Agreement and the

---

[179] TT 455–56 (Clarke); TT 698 (Austin Smith).  By any measure, both experts are well qualified.  *See* JX 18 (Report of David G. Clarke, ASA ["Clarke Report"]) at 8 (describing qualifications); JX 20 (Austin Smith Report) at 3 (describing qualifications).   And both did what they were engaged to do here – advocate their side's position on fair value – quite effectively.  It is accepted in Delaware appraisal litigation that paid valuation experts have assumed more of an advocacy role, and less of a traditional expert witness role (as illustrated by the wide deltas we regularly see in their valuation conclusions).  *See Dell,* 177 A.3d at 24 ("the price produced by an efficient market is generally a more reliable assessment of fair value than the view of a single analyst, especially an expert witness who caters her valuation to the litigation imperatives of a well-heeled client"); *Global GT LP v. Golden Telecom,* 993 A.2d 497, 498–99 (Del. Ch. 2010) ("Both these men of valuation science *purported* to apply the same primary method of valuation—the discounted cash flow ('DCF') method—but the expert for the petitioners came up with a value of $139 per share and the expert for Golden came up with a value of only $88 per share—a modest $51 per share value gap." (emphasis supplied)).  Despite the repeated expressions of frustration by our courts, the practice continues.  When a rushing river flows against a resisting rock, eventually the river wins out.  Perhaps that is the hope among appraisal advocates and the valuation experts they engage to sponsor their positions.

[180] TT 243–44 (Subramanian).   Subramanian is "the H. Douglas Weaver Professor of Business Law at the Harvard Business School (HBS) and the Joseph Flom Professor of Law and Business at the Harvard Law School (HLS)."  JX 19 (Expert Report of Guhan Subramanian ["Subramanian Report"]) at 2; *see id.* (describing qualifications).

post-signing go-shop process was not an effective tool for price discovery . . . ."[181] According to Clarke, a DCF analysis premised on the Base Case projections provides the most reliable evidence of Norcraft's fair value as of the Merger date.[182] Based on his DCF analysis, Clarke concluded that Norcraft's fair value as of the Merger was $34.78 per share.[183]

For his DCF analysis, Clarke chose to extend the Base Case projections for an additional five years (through 2024), before applying a perpetuity growth rate ("PGR") of 3.5% at the end of the projection period.[184] He also adjusted the Base Case projections to deduct for income tax expense in each projected year, which the Base Case projections presented in Norcraft's Schedule 14D-9 failed to do.[185]

---

[181] JX 18 (Clarke Report) at 17 (quoting JX 19 (Subramanian Report) at 25) (internal quotation marks omitted). Clarke did not offer any independent analysis as to why the Merger Price is not a reliable indicator of Norcraft's fair value as of the Merger date; instead, he adopted in full Subramanian's conclusion on that point. *See* JX 18 (Clarke Report) at 6, 17.

[182] *See id.* at 2.

[183] *Id.*

[184] *Id.* at 2–3. The extension of the projections, according to Clarke, was required to reduce Norcraft's growth rates gradually to a "steady state." In this regard, Clarke notes that "if [he] had to use 2019 as the final year of [his] projections, [he] would then need to use a higher [PGR of 4.4%] to account for the tapering of [Norcraft's] growth to a steady state." JX 21 (Rebuttal Report of David G. Clarke, ASA ["Clarke Rebuttal Report"]) at 27 n.62.

[185] JX 18 (Clarke Report) at 24; JX 1 (Ginter Dep.) at 44–45.

After determining Norcraft's projected unlevered free cash flows through Norcraft's FY2024, Clarke then discounted each year's projected free cash flow amount to present value using a 9.6% discount rate based on an estimate of Norcraft's weighted average cost of capital ("WACC").[186] With these inputs, Clarke concluded that the present value of Norcraft's projected unlevered free cash flows through FY2024 was $297.3 million.[187]

Clarke then calculated Norcraft's terminal value by (1) dividing Norcraft's terminal year unlevered free cash flow by a capitalization rate of 6.1% and (2) discounting the quotient of that calculation to present value using Norcraft's

---

[186] JX 18 (Clarke Report) at 3, 42. To derive Norcraft's WACC, Clarke first "calculated [1] Norcraft's cost of equity based on the capital asset pricing model ('CAPM') and [2] Norcraft's long-term[,] [after-tax] cost of debt." *Id.* at 3, 33. Clarke next multiplied (1) Norcraft's estimated cost of equity (11.4%) by the proportion of equity in Norcraft's capital structure (approximately 75%), as measured by Norcraft's (undiluted) market capitalization immediately before the Merger's announcement ($396 million); and (2) Norcraft's estimated after-tax cost of debt (4.31%) by the proportion of debt in Norcraft's capital structure (approximately 25%), as measured by the book value of Norcraft's long-term debt on March 29, 2015 ($147.5 million). *Id.* at 33, 42 & sched. 5-B. Finally, Clarke summed the product of each calculation to obtain a WACC of 9.6%. *Id.* at 33.

[187] *Id.*, sched. 2-A (DCF analysis).

estimated 9.6% WACC.[188]   This yielded a terminal value of $509.5 million.[189]

Clarke then added Norcraft's terminal value to the present value of Norcraft's

projected unlevered free cash flows through FY2024 to obtain an $806.8 million

operating value.[190]

Clarke next made the following adjustments to Norcraft's operating value to

derive Norcraft's total equity value: (1) adding Norcraft's excess cash, estimated at

$44.3 million; (2) adding the value (to Norcraft) of TRA-related tax benefits,

estimated at $4.4 million; (3) adding cash received by Norcraft from the (presumed)

exercise of all outstanding options on Norcraft stock, estimated at $18.3 million; and

(4) deducting the book value of Norcraft's long-term debt—$147.5 million, per

Norcraft's Form 10-Q for Q1 FY2015.[191]   After making these adjustments, Clarke

---

[188] *Id.*, sched. 2-A (DCF analysis). Terminal year free cash flow is the future value implied by (1) the subject company's projected revenue and expense items in the final year of the discrete projection period; and (2) the subject company's estimated PGR. *See id.* Clarke calculated Norcraft's capitalization rate as the positive difference of Norcraft's estimated WACC (9.6%) and estimated PGR (3.5%). *Id.* at 43.

[189] *Id.*, sched. 2-A (DCF analysis).

[190] *Id.*

[191] *Id.* Operating value, as stated here, represents the present value of Norcraft's future unlevered free cash flows. *Id.* A DCF analysis, however, attempts to derive the value of the subject company's equity. *Id.* at 45. Thus, adjustments to the operating value are generally necessary to add in equity in the form of excess cash (or cash equivalents) and to remove debt. *Id.* at 45–47. Clarke based his excess cash and "cash from option exercise" estimates on the information disclosed in the Base Case projections and Norcraft's Form 10-Q for Q1 FY2015. *Id.* at 45. He based his estimation of the TRA-related tax

concluded that Norcraft's total equity value was $726.3 million.[192] Finally, Clarke divided this aggregate value by Norcraft's "fully diluted" shares outstanding (20,880,123) to obtain an aliquot value of $34.78 per share.[193]

Clarke also performed a comparable company analysis to confirm the results of his DCF analysis.[194] For this analysis, he selected four companies for his peer group: (1) American Woodmark, (2) Masonite International Corp. ("Masonite"), (3) PGT Innovations, Inc. ("PGT") and (4) Ply Gem Holdings, Inc. ("Ply Gem").[195] The analysis yielded a $33.92 per share valuation.[196] Clarke "determined not to weight this analysis in determining a specific per share value [for Norcraft], however, due to the difficulties in finding any companies that were fully comparable to Norcraft."[197]

---

benefits on the "[I.R.C. §] 743(b) and [net operating loss] utilization" projections included in Citi's March 28, 2015 presentation to the Norcraft Board. *Id.* at 46.

[192] *Id.* at 48.

[193] *Id.* Clarke calculated Norcraft's "fully diluted shares outstanding" as the sum of (1) the total number of Norcraft shares and stock options outstanding as of the Merger date; and (2) the total number of convertible Norcraft LLC units (convertible into Norcraft stock) outstanding on that date. *Id.*

[194] *Id.* at 2–4.

[195] *Id.* at 51.

[196] *Id.* at 4.

[197] *Id.* at 2.

## 2. Austin Smith's Opinion Regarding Norcraft's Fair Value

Austin Smith determined that the most reliable indicator of Norcraft's fair value as of the Merger date was the Merger Price, "*less* . . . contemporaneously estimated synergies [of $3.60 per share]"[198]—a metric that yields a valuation of $21.60 per share. Austin Smith also conducted an independent valuation using three different valuation methodologies: DCF, comparable company and precedent transaction analyses.[199] Based on those approaches, Austin Smith determined that Norcraft's fair value as of the Merger date "ranged from $17.48 to no more than $23.74."[200]

Austin Smith's primary DCF analysis, like Clarke's, relied on the Base Case projections (adjusted to deduct for income tax expense in each of the projected years) and applied a 3.5% PGR at the end of the projection period.[201] Unlike Clarke, however, Austin Smith did not extend the Base Case projections.[202]

---

[198] JX 20 (Austin Smith Report) at 29 (emphasis in original). Austin Smith based her $3.60 per share "synergies" figure on "the presentations of Citi and the work done by RBC." TT 704:24–705:1 (Austin Smith).

[199] JX 20 (Austin Smith Report) at 1.

[200] *Id.*

[201] *Id.* at 20–21, 23 & Ex. 6 (DCF Analysis). Austin Smith performed two additional DCF analyses, one relying on the Ginter 2014 Projections, which valued Norcraft at $15.59 per share, and another relying on a Capitalization of Cash Flow methodology, which valued Norcraft at $12.65 per share. *Id.* at 23–24.

[202] *Id.* at 23 & Ex. 6 (DCF Analysis).

After determining Norcraft's projected unlevered free cash flows through Norcraft's FY2019, Austin Smith discounted each year's projected free cash flow amount to present value using a 11.2% discount rate based on her estimate of Norcraft's WACC.[203] From this, Austin Smith concluded that the present value of Norcraft's projected unlevered free cash flows through FY2019 was $151 million.[204]

Austin Smith then calculated Norcraft's terminal value by (1) dividing Norcraft's terminal year unlevered free cash flow by a capitalization rate of 7.69% and (2) discounting the quotient of that calculation to present value using Norcraft's estimated 11.2% WACC.[205] Austin Smith concluded that Norcraft's terminal value was $435 million.[206] She then added Norcraft's terminal value to the present value

---

[203] *Id.* at 20.

[204] *Id.*, Ex. 6 (DCF Analysis). To derive Norcraft's WACC, Austin Smith first calculated (1) Norcraft's cost of equity based on CAPM and (2) Norcraft's after-tax cost of debt (using a 37.69% tax rate). *Id.*, Ex. 5 (Calculation of WACC). She next multiplied (1) Norcraft's estimated cost of equity (12.4%) by a target proportion of equity in Norcraft's capital structure (86%), based on the capital structure of selected comparable companies; and (2) Norcraft's estimated after-tax cost of debt (3.6%) by a target proportion of debt in Norcraft's capital structure (14%), again based on a "comparable capital structure" approach. *Id.*, Exs. 4 (Calculation of Beta) and 5 (Calculation of WACC). Finally, Austin Smith summed the product of each calculation to obtain a WACC of 11.2%. *Id.*, Ex. 5 (Calculation of WACC).

[205] *See id.*, Ex. 5 (Calculation of WACC). This is the same approach Clarke followed to determine terminal value (with different inputs). JX 18 (Clarke Report), sched. 2-A (DCF analysis).

[206] JX 20 (Austin Smith Report), Ex. 6 (DCF Analysis).

of Norcraft's projected unlevered free cash flows through FY2019 to obtain a $586 million operating value.[207]

Austin Smith made two adjustments to Norcraft's operating value to determine Norcraft's total equity value: (1) adding Norcraft's excess cash, estimated at $52.7 million[208]; and (2) deducting the book value of Norcraft's long-term debt—$147.5 million, per Norcraft's Form 10-Q for Q1 FY2015.[209] Having made these adjustments, Austin Smith concluded that Norcraft's total equity value was $491 million.[210] She then divided this total equity value by Norcraft's "fully diluted" shares outstanding (20,880,123) to obtain an aliquot value of $23.54 per share.[211]

---

[207] *Id.*

[208] JX 537 (native Excel version of Austin Smith's DCF model). Austin Smith calculated Norcraft's excess cash on the Merger date based on the "Cash from Norcraft" figure in the "Funds Flow Memorandum" prepared in connection with the Merger ($54,396,335.01), JX 249 at 2, *less* a $20 million cash balance (cash for operations, per the Base Case projections) *plus* the product of (1) Norcraft's total options outstanding as of the Merger date (1,142,383) and (2) the weighted average exercise price of those options ($16.01). JX 20 (Austin Smith Report), Ex. 6 (DCF Analysis) (drawing option-related information from Norcraft's Q1 FY 2015 10-Q, JX 248 at 14).

[209] JX 20 (Austin Smith Report), Ex. 6 (DCF Analysis).

[210] *Id.*

[211] *Id.* Austin Smith calculated Norcraft's fully diluted shares outstanding as 20,869,976. JX20 (Austin Smith Report) at 13 & n.25. It is unclear how Austin Smith derived this figure, and the figure conflicts with the information set forth in Norcraft's Form 10-a for Q1 FY2015 and the "Funds Flow Memorandum" prepared in connection with the Merger. *See* JX 248 (Norcraft's Q1 FY2015 Form 10-Q) at 4, 11 (17,311,573 shares of Norcraft common stock outstanding, 2,426,167 convertible Norcraft LLC units outstanding and 1,142,383 options on Norcraft stock outstanding as of March 31, 2015); JX 249 (Funds Flow Memorandum) at 3, 11 (18,947,886 shares of Norcraft common stock outstanding,

Finally, upon "summing th[is] . . . component[] of [Norcraft's] value" with the value of the TRA-related tax benefits that Norcraft would realize in each projected year (estimated at $0.20 per share), Austin Smith determined that "the per share value of Norcraft was $23.74" as of the Merger date.[212]

As noted, Austin Smith also undertook to value Norcraft using two "market-based" valuation methodologies. Her comparable company analysis yielded a valuation of $23.46 per share and her precedent transaction analysis yielded a valuation of $17.48 per share.[213]

According to Austin Smith, "[t]he high level of consistency between [her] three separately determined estimates of fair value and the [Merger Price] (less synergies) provides strong analytical support that $21.90 accurately represents the per share fair value of Norcraft."[214] In addition, Austin Smith submits, "the fact that the [Merger Price] derived from a robust deal process" lends "additional support" to her fair value determination.[215]

---

789,854 convertible Norcraft LLC units outstanding and 1,142,383 options on Norcraft stock outstanding as of May 11, 2015). Both documents indicate a figure of 20,880,123 fully diluted shares outstanding as of the Merger date.

[212] JX 20 (Austin Smith Report) at 23.

[213] *Id.* at 25–28.

[214] *Id.* at 29.

[215] *Id.* In her reports and trial testimony, Austin Smith provided only a cursory—and mostly conclusory—discussion of Norcraft's deal process. *See id.* at 19–20; TT 701–703

### 3. Subramanian's Opinion Regarding Norcraft's Deal Process

Professor Subramanian served as Petitioner's deal process expert.[216] According to Subramanian, Norcraft's deal process was flawed in several respects that rendered the process "unlikely to have yielded fair value for the Norcraft shareholders."[217] The principal flaws Subramanian identifies are (1) the lack of any "competitive process to acquire Norcraft prior to the signing of the Merger Agreement"[218]; (2) information asymmetries between Fortune and potential third-party bidders[219]; and (3) the presence of certain deal protection mechanisms that curbed the efficacy of the go-shop and effectively truncated the Go-Shop Period by at least five days.[220]

#### a. Absence of Pre-Signing Competition

Subramanian posits that Norcraft's "decision to negotiate exclusively with Fortune" prior to signing the Merger Agreement "eliminated a standard source of bargaining leverage for Norcraft"—namely, "invok[ing] the threat of an alternative

---

(Austin Smith). She also acknowledged that she had never before been called upon to offer expert testimony on the efficacy of a sales process. TT 791:20–24 (Austin Smith).

[216] JX 19 (Subramanian Report) at 24–25.

[217] *Id.* at 26.

[218] *Id.*

[219] *Id.* at 25, 33–36.

[220] *Id.* at 25, 45–52.

deal" to extract a higher price.[221] Consequently, Norcraft was unable to move Fortune above its proposed purchase price of $25.50.[222] Moreover, Subramanian submits, it does not appear "that Norcraft extracted something else [from Fortune] in exchange for exclusivity."[223]

As a practical matter, the absence of pre-signing competition "meant that the Norcraft Board was relying on [the] go-shop process to ensure that Norcraft shareholders received fair value."[224] According to Subramanian, this reliance was misplaced because Norcraft's go-shop process was so poorly structured that it was rendered entirely ineffective as a price discovery tool.[225]

### b. Information Asymmetries

Subramanian next posits that certain information asymmetries between Fortune and prospective acquirors vitiated the effectiveness of Norcraft's go-shop process.[226] As noted, Fortune first approached Norcraft regarding a potential acquisition on October 20, 2014, and the parties signed a confidentiality agreement

---

[221] *Id.* at 30 (internal quotation and footnote omitted).

[222] *Id.* at 31; *see* TT 100:4–17 (Biggart); JX 238 (Norcraft Schedule 14D-9) at 13.

[223] JX 19 (Subramanian Report) at 31.

[224] *Id.* at 32.

[225] *Id.* at 32–33.

[226] *Id.* at 25, 33–36.

on December 11, 2014.[227] Exclusivity soon followed.[228] This dynamic gave Fortune a substantial head start relative to other potential suitors in evaluating the benefits and challenges of a Norcraft transaction, including the complex issues relating to the TRAs.[229] And, per Subramanian, "[t]his discrepancy . . . created a severe information asymmetry problem, because it would be virtually impossible for prospective third-party bidders to [learn] as much about Norcraft as Fortune [already knew]" in the thirty-five days allotted for Norcraft's go-shop process.[230]

Moreover, Subramanian submits, regardless of whether Fortune's "first mover" status provided it with an actual benefit, potential competing bidders would have perceived Fortune to enjoy an informational advantage.[231] That perceived advantage, in turn, discouraged others from bidding for Norcraft to avoid the "winner's curse"—a phenomenon that occurs in common value auction settings

---

[227] PTO ¶¶ 2k, 2p.

[228] PTO ¶ 2w.

[229] JX 19 (Subramanian Report) at 29–30, 34 ("Fortune . . . signed a confidentiality agreement on December 11th, 2014, and then had 110 days of exclusive access to confidential information and management time at Norcraft before the deal was announced on March 30th, 2015."). During the course of those 110 days, both Norcraft and Fortune had to deal not only with valuation issues relating to the Norcraft business, but also complex tax and valuation issues (with the help of separate independent experts) relating to the TRAs. JX 5 (Klein Dep.) at 137–38.

[230] JX 19 (Subramanian Report) at 34.

[231] See id. at 35.

53

where the winning bidder has "buyer's remorse" because it has overpaid for the asset in question.[232] That remorse is a product, in part, of the winner's perception that it lacked an adequate understanding of the asset before it made its bid.[233] Here, Subramanian submits, because potential competing bidders for Norcraft perceived that Fortune knew more about the Company than they could hope to learn in thirty-five days, they may well have feared that they would end up overpaying to acquire Norcraft if they outbid Fortune.[234]

### c. Deal Structure Minimizes Efficacy of the Go-Shop

According to Subramanian, the interaction between certain deal protection provisions in the Merger Agreement and the TSAs effectively truncated the Go-Shop Period "from 35 days to 30 days or even shorter."[235] As noted, the Merger Agreement entitled Fortune to launch Tahiti's tender offer for Norcraft's stock fifteen days into the Go-Shop Period.[236] In addition, under the TSAs, Buller, SKM and Trimaran were obligated to tender 53.6% of Norcraft's outstanding voting stock

---

[232] *Id.* at 35–36 (citing Guhan Subramanian, *Deal Making: The New Strategy of Negotiauctions* 87–88 (2011)).

[233] *Id.* at 40–41.

[234] *Id.* Per Subramanian, Fortune's unlimited match right compounded the "winner's curse" problem, and so operated as a "'powerful disincentive' to prospective third-party bidders." *Id.* at 43 (footnote and citation omitted).

[235] *Id.* at 52.

[236] JX 221 (Merger Agreement), pmbl. & § 1.1.

into Tahiti's tender offer "promptly following" the initiation of the offer and, in any event, no later than two days before the offer's initial expiration date.[237] And that tender could not be rescinded absent a "full-blown superior proposal."[238]

Thus, if Fortune launched Tahiti's tender offer halfway through Norcraft's go-shop process (as it did),[239] 53.6% of Norcraft's voting shares would "promptly" be tendered to Tahiti—and that tender would be irrevocable absent a superior proposal. Moreover, even if Norcraft received a superior proposal during the Go-Shop Period, Fortune would still have at least four days to match that proposal.[240]

According to Subramanian, the confluence of the deal protections, the limited duration of the Go-Shop Period, Fortune's unlimited match right, the definition of "superior proposal" and Fortune's ability to launch Tahiti's tender offer during the go-shop, resulted in a systematic "tightening and shortening" of the go-shop process. The "tightening" occurred because "a third party would have to make a full-blown superior proposal, not just get to excluded party status, by the end of the 35 days."[241] The full-blown superior proposal was required for Norcraft to terminate the Merger

---

[237] JX 229 (Buller TSA) § 3; JX 230 (SKM TSA) § 3; JX 231 (Trimaran TSA) § 3.

[238] TT 254:21–255:7 (Subramanian); JX 221 (Merger Agreement) § 1.1.

[239] PTO ¶ 2ee.

[240] JX 221 (Merger Agreement) § 5.4(g).

[241] TT 255:4–7 (Subramanian).

Agreement and prevent Tahiti from accepting the shares tendered pursuant to the TSAs (a majority of the shares outstanding). Subramanian explained:

> Ordinarily, if this was a normal go-shop, you'd have excluded party status by the end of the go-shop period. But . . . [here] you've got to get to a superior proposal. Got to get the whole shebang done, as Chancellor Strine said it in *Lear*, by the end of the go-shop period. And in my observation and in my experience looking at these go-shops, that is a big deal. Having to get to an entire superior proposal by the end of the go-shop period is a very different task than getting to simply excluded party status.[242]

The "shortening" occurred because any potential bidder contemplating whether to participate in the go-shop could wait no longer than April 30—what Subramanian terms the "last clear chance" date—to make its superior proposal if it wanted to ensure that (i) the Norcraft Board had the two business days it was allowed under the Merger Agreement to assess the proposal and declare it superior; (ii) Fortune's four-business-day period to match expired; and (iii) Norcraft terminated the Merger Agreement before Fortune (via Tahiti) could close on the tendered Covered Shares. The following graphic from Subramanian's report illustrates the "tightening and shortening" phenomenon:

---

[242] TT 299:18–300:4 (Subramanian).

### "Last Clear Chance" For a Third-Party Was On April 30th



JX19 at 45-52  [18]

Subramanian also observes that, even without the "tightening and shortening" of the go-shop, Fortune's unlimited match right stands alone as a disabling feature of this go-shop.[243]  According to Subramanian, from the perspective of a potential bidder, unlimited match rights are typically perceived as limiting any "pathway to success."[244]  Indeed, Subramanian submits, "[e]verybody agrees that match rights deter bids.  It [is] not even a debated question."[245]

---

[243] JX 19 (Subramanian Report) at 41–44; JX 221 (Merger Agreement) at § 5.4(g).

[244] JX 19 (Subramanian Report) at 50.

[245] TT 254:4–7 (Subramanian).

Here again, Fortune was acutely aware of the advantage it secured, while Norcraft's Board apparently did not understand what an unlimited match right was much less how that deal protection might work to hinder the go-shop.[246] In describing the disparity in the sophistication of the two parties negotiating this Merger, Subramanian observed: "it seems like . . . the Fortune side was playing chess and the Norcraft side was playing checkers."[247]

## J. Procedural Posture

Petitioners filed a petition with this Court on June 22, 2015, seeking appraisal of their 557,631 shares of Norcraft common stock.[248] The Court held a four-day trial in June 2017, and the parties thereafter submitted post-trial briefing. On December 20, 2017, the Court requested supplemental submissions from the parties to address certain questions following the Delaware Supreme Court's December 14, 2017, decision in *Dell*.[249] The Court heard post-trial argument on April 25, 2018.

---

[246] *Compare* JX 232 (e-mail chain between RBC, Klein and other members of Fortune's deal team, Apr. 7, 2015) *with* JX 11 (Reilly Dep.) at 125:3–22 *and* JX 3 (Buller Dep.) at 206:16–207:24.

[247] TT 269:8–11 (Subramanian).

[248] JX 260 (Petition for Appraisal).

[249] 177 A.3d 1; D.I. 91.

## II. ANALYSIS

Our appraisal statute, 8 *Del. C.* § 262, provides, "[t]hrough [the appraisal] proceeding, the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value. In determining such fair value, the Court shall take into account all relevant factors."[250] "Easy enough," one might say on a first read, but the judicial appraisal process, through the years, has proven to be anything but "easy."[251]

"Section 262(h) unambiguously calls upon the Court of Chancery to perform an independent evaluation of 'fair value' at the time of a transaction . . . [and] vests

---

[250] 8 *Del. C.* § 262(h).

[251] *See, e.g., In re Orchard Enters., Inc.,* 2012 WL 2923305, at *18 (Del. Ch. July 18, 2012) ("As a law-trained judge who has to come up with a valuation deploying the learning of the field of corporate finance, I choose to deploy one accepted method as well as I am able, given the record before me and my own abilities."); *Global GT LP,* 993 A.2d at 517 n.126 (explaining that "academics and professionals throw around . . . ranges of value [that] are used by a law-trained judge to come to a single point estimate of value" and that "[t]he law-trained judges who must perform such analyses are more conscious than anyone of the inherent risk of error in such an endeavor, and indeed of the reality that no one can really tell if an error was made"), *aff'd,* 11 A.3d 214; *Finkelstein,* 2005 WL 1074364, at *12 ("The judges of this court are unremittingly mindful of the fact that a judicially selected determination of fair value is just that, a law-trained judge's estimate that bears little resemblance to a scientific measurement of a physical reality."). Indeed, "the judges of this Court" have lamented the challenges posed by the appraisal statute for many years. While perhaps repetitive, these expressions serve a valuable function; they serve as a longhand way of saying to the parties and the community of interest: "I've done the best I can here."

the Chancellor and Vice Chancellors with significant discretion to consider 'all relevant factors' and determine the going concern value of the underlying company."[252] "By instructing the court to 'take into account all relevant factors' in determining fair value, the statute requires the Court of Chancery to give fair consideration to 'proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court.' Given that '[e]very company is different; [and] every merger is different,' the appraisal endeavor is 'by design, a flexible process.'"[253]

Taking to heart the mandate of Section 262(h), as reiterated by our Supreme Court, I have carefully considered all relevant factors. And I have assigned those factors the weight (or not) I determined they deserve based on my evaluation of the credible evidence, and my application of "accepted financial principles" as derived from that evidence.[254]

## A. The Merger Price is Not a Reliable Indicator of Norcraft's Fair Value

As our Supreme Court has recognized, "corporate finance theory reflects a belief that if an asset—such as the value of a company as reflected in the trading

---

[252] *DFC*, 172 A.3d at 364 (quoting 8 *Del. C.* § 262(h)).

[253] *Dell*, 177 A.3d at 21 (quoting *Weinberger v. UOP*, 457 A.2d 701, 713 (Del. 1983); *Golden Telecom*, 11 A.3d at 218; and *In re PetSmart, Inc.*, 2017 WL 2303599, at *26 (Del. Ch. May 26, 2017)) (alteration in original).

[254] *Dell*, 177 A.3d at 22.

value of its stock—can be subject to close examination and bidding by many humans with an incentive to estimate its future cash flows['] value, the resulting collective judgment as to value is likely to be highly informative[.]"[255] So long as "all estimators hav[e] equal access to information, the likelihood of outguessing the market over time and building a portfolio of stocks beating it is slight."[256] Thus, the Supreme Court has emphasized that our courts must appreciate "the economic reality that the sale value resulting from a robust market check will often be the most reliable evidence of fair value, and that second-guessing the value arrived upon by the collective views of many sophisticated parties with a real stake in the matter is hazardous."[257]

Nevertheless, our Supreme Court has declined on several occasions to pronounce a presumption in favor of deal price in determining fair value.[258] Instead, it has reiterated the "flexible" nature of the trial court's fair value calculus, while also noting its lack of "confidence in [its] ability to craft, on a general basis, the

---

[255] *DFC*, 172 A.3d at 370.

[256] *Id.*

[257] *Id.* at 366.

[258] *See, e.g., id.*; *Golden Telecom*, 11 A.3d at 217–18.

precise pre-conditions that would be necessary to invoke a presumption" in favor of the deal price.[259]

Here, Norcraft's deal process did not include a meaningful market check and, consequently, the Merger Price was not "arrived upon by the collective views of many sophisticated parties with a real stake in the matter."[260] Prior to the execution of the Merger Agreement, the Company chose to negotiate with Fortune and Fortune alone.[261] That decision, if made as a strategic choice, does not alone render Norcraft's deal process unsound.[262] Nor does it preclude a finding that Norcraft's deal process resulted in a reliable indication of fair value (reflected by the Merger Price). Indeed, even Petitioners' expert has acknowledged that negotiating with a

---

[259] *DFC*, 172 A.3d at 366.

[260] *Id.*

[261] TT 13–15 (Eldridge).

[262] *See In re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147, at *13–14 (Del. Ch. Aug. 8, 1988) (finding board-chosen single-bidder process satisfied *Revlon* duties); *In re Pennaco Energy, Inc.*, 787 A.2d 691, 706 (Del. Ch. 2001) ("[T]he mere fact that the Pennaco board decided to focus on negotiating a favorable price with Marathon and not to seek out other bidders is not one that alone supports a breach of fiduciary duty claim."); *In re MONY Gp. Inc. S'holder Litig.*, 852 A.2d 9, 21 (Del. Ch. 2004) (same) (quoting *Pennaco*, 787 A.2d at 706).

single potential buyer pre-signing can, in certain instances, lead to significant value.[263]

But the single bidder focus here, while perhaps not amounting to a breach of fiduciary duty,[264] did not provide a meaningful market check as would yield a reliable indication of fair value. First, there is no evidence that the Board or Citi employed a single bidder approach for the sake of achieving a strategic advantage or maximizing value. Second, and more troubling, the Board's focus on only one bidder was tainted by the fact that Buller (who was conflicted) served as Norcraft's lead negotiator from start to finish.

The shambolic pre-signing process left Norcraft's post-signing go-shop as the only meaningful opportunity to check the market.[265] Unfortunately, Fortune

---

[263] JX 31 (Guhan Subramanian, *Go-Shops vs. No-Shops in Private Equity Deals: Evidence and Implications*, 63 Bus. Law. 729 (2008)) at 755 ("[A] pure go-shop can be a valuable tool for extracting the highest possible price in the sale of [a] company.").

[264] *M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 797 (Del. 1999) ("A fair merger price in the context of a breach of fiduciary duty claim will not always be a fair value in the context of determining going concern value."); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 78 (Del. Ch. 2013) ("A court could conclude that a price fell within the range of fairness and would not support fiduciary liability, yet still find that the point calculation demanded by the appraisal statute yields an award in excess of the merger price."); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 466 (Del. Ch. 2011) (same).

[265] Petitioners urge the Court to conclude that "a go-shop only process" is, *per se*, inadequate to generate fair value. Pet'rs' Post Trial Opening Br. 3 (citing *IQ Hldgs. v. Am. Commercial Lines*, 2013 WL 4056207 (Del. Ch. Mar. 18, 2013) and *Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807, at *13 (Del. Ch. Nov. 1, 2013)). Having reviewed the cited authority, I do not see where *IQ Holdings* addressed the issue at all. As for *CKx, Inc.*, while the court acknowledges that a scenario where the only market check is an

extracted concessions from Norcraft that rendered the go-shop process equally ineffective as a price discovery tool.

### 1. The Board's Singular Focus on Fortune, Failure to Manage Buller's Conflicts and Misplaced Reliance on the Go-Shop

There is no dispute that neither Norcraft nor Citi contacted other bidders before Norcraft signed the Merger Agreement. This resulted in lost opportunities. Not only did Norcraft miss the opportunity to test the market before committing to Fortune, it also missed the opportunity to leverage the interest of another suitor to extract a higher price from Fortune. Given these missed opportunities, it is not surprising that, by the time the parties settled on the Merger Price, Norcraft's management still believed that the merger consideration was too low.[266] The plan, therefore, was to put all eggs in the go-shop basket as a means to achieve fair value for Norcraft stockholders.[267]

---

unsuccessful go-shop might undermine the reliability of the deal price as an indicator of fair value, the court says nothing of adopting a rule that a go-shop alone will *never* produce fair value for the target. *Id.* at *13. I see no basis in law or fact to adopt such a rule.

[266] JX 140 (e-mail from Reilly to Buller, Maselli and Citi representatives, Feb. 20, 2015) (Reilly: "I do believe we are leaving $ on the table"); TT 29:19–22 (Eldridge) (Buller "eager to try and find a buyer at a higher valuation"); JX 138 (e-mail from Ginter to Buller, Feb. 19, 2015) ("Current offer will be 10.9x or less by the time we close in April at $25.50. so we weren't happy with the deal in [O]ct[ober] but now we are?").

[267] *See* JX 3 (Buller Dep.) at 85–86.

Of course, on the other side of the table, Fortune perceived the Merger Price as very favorable (to Fortune).[268] It was protective of that price and sought to avoid or limit the go-shop to preclude a topping bid.[269] And that is precisely what it did.

Norcraft's Board left the negotiations principally to Buller. Yet Buller was just as (if not more) fixated on extracting commitments from Fortune regarding the TRAs and his future role with the combined company as he was on securing the best price possible for Norcraft. Fortune, for its part, was "stringing Buller along" as it negotiated with him over the Merger Price, leading him to believe he might continue

---

[268] JX 185 (e-mail chain between Fortune director David Mackay and Klein, Mar. 20, 2015) (Mackay: "Looks very positive[.] A good strategic fit at a reasonable price . . . I fully support the deal and hope no one comes along and offers more."); *id.* (Klein:"You are spot on – its [sic] a good price, and there is a risk someone comes along and tries to top the offer."); JX 300 (Mar. 31, 2015 e-mail from Fortune director Mackay to Fortune's other directors and deal team members) ("Let's hope no one bids!").

[269] TT 146:18–147:9 (Biggart) (explaining a Fortune presentation analyzing potential go-shop competitors "[b]ecause at this point in time, we're about to agree to a go-shop, and our CEO is very upset about the idea of doing this"); *see also* JX 5 (Klein Dep.) at 164:11–22 ("Q. And Norcraft insisted on some type of go-shop process, right? A. Yes. Q. And in the context of negotiating that, your goal was to minimize the chances that the go-shop process would result in a higher bidder, -- A. I wanted to -- Q. -- correct? A. -- give them what they needed – the minimum amount they needed to satisfy their fiduciary responsibility which I know they had."). Of course, it is not unusual—or inherently problematic—for a prospective acquiror to want to avoid being outbid after having expended considerable time, effort and funds. Fortune's attitude, however, suggests that it appreciated the pre-sign process did not yield fair value for Norcraft stockholders and that it wanted to protect that advantage throughout the go-shop process. Again, this is precisely what the Board reasonably should have expected from the party sitting on the other side of the table.

his employment with Fortune post-close.[270]  When Fortune finally informed Buller (after settling on the Merger Price) that he would have no place at Fortune post-close, Fortune secured Buller's continued commitment to the Merger by stringing him along again, this time by dangling the possibility that Fortune would be willing to sell Norcraft Canada to Buller after the closing.[271]

The Board either did not appreciate Buller's conflict, or chose not to manage it, until Buller announced that he would pursue the acquisition of Norcraft Canada after closing.[272]  By then, Buller had been spurring with Fortune in an attempt to extract every dollar he demanded for the TRAs (diverting consideration from the stockholders) and had pushed hard for post-closing employment with Fortune.  Yet all along, the Board did nothing to manage the conflict—it did not form a special committee of its members to negotiate with Fortune or take any other steps to neutralize Buller's influence.  Even its half-hearted effort to recuse Buller from

---

[270] JX 166 (e-mail from Klein to Fortune deal team, Mar. 12, 2015); TT 205 (Biggart) (On March 6, 2015, Fortune "definitively told [Buller] he didn't have the job.").

[271] *See* JX 189 (e-mail chain between Dave Randich, head of Fortune's cabinet division, Klein and members of Fortune's deal team, Mar. 23, 2015); JX 199 (Mar. 26, 2015 e-mail from RBC to Klein and other members of Fortune's deal team); JX 202 (Mar. 27, 2015 e-mail from Buller to PwC); JX 194 (e-mail chain between members of Norcraft and Fortune deal teams, Mar. 25, 2015).

[272] JX 11 (Reilly Dep.) at 158–160.

further Board deliberations regarding the Merger following his demonstrated interest in Norcraft Canada proved ineffective.[273]

Given that the single-bidder pre-signing process led by a conflicted negotiator yielded what at least some within Norcraft deemed unsatisfactory consideration, it was imperative that the Norcraft Board run an effective post-signing go-shop. It did not.

## 2. The Post-Sign Go-Shop Provides No Basis to Rely on the Deal Price

Although it is hardly clear that Norcraft's Board appreciated this fact, the ineffective pre-signing process should have made clear that the post-signing go-shop would offer the only real opportunity for a meaningful market check.[274] Unfortunately, that process fell far short on many levels, as the following evidence illustrates:

- Prior to the Go-Shop Period, it was not widely known that Norcraft was "up for sale"[275]; thus, potentially interested parties did not know that Norcraft was

---

[273] JX 13 (Biggart Dep.) at 107–109, 111:6–112:3; JX 194 (e-mail chain between members of Norcraft and Fortune deal teams, Mar. 25, 2015).

[274] *In re AOL, Inc.*, 2018 WL 1037450, at *9 (Del. Ch. Feb. 23, 2018) (observing "if front-end information sharing is truncated or limited, the post-agreement period should be correspondingly robust, so to ensure that information is sufficiently disseminated that an informed sale can take place and bids can be received without disabling impediments").

[275] The Merger Agreement was publicly announced on March 30, 2015. *See* JX 227 (Norcraft Mar. 30, 2015 Proxy Statement) at 3. That same day, the Go-Shop Period began. PTO ¶ 2cc.

"in play" before the Merger was announced, putting them several steps behind Fortune in pursuing an acquisition of Norcraft[276];

- Norcraft's Board appeared to lack even a basic understanding of the terms and function of the go-shop[277];

---

[276] JX 19 (Subramanian Report) at 34; JX 243 (Citi Buyers Log) at 2 ("investment is too big [] to consider in a short period"); *id.* at 12 ("can't move fast enough in 35 days"); *id.* at 2, 5, 7–9 (prospective bidders explaining they had no interest in competing against Fortune).

[277] *See, e.g.,* JX 3 (Buller Dep.) at 207:5–24 ("Q. Do you know what Norcraft's rights were if another proposal came in during the go-shop period? A. Don't recall. Q. Do you have any knowledge of what Norcraft could have done if one of the go-shop parties was interested and made a bid? A. We could have pursued the offer. Q. Were there any restrictions on Norcraft's ability to pursue an offer? A. Some, but I don't recall what they were. . . . Q. Do you recall anything about Fortune's rights if another offer came in? A. I don't recall."); JX 8 (Eldridge Dep.) at 85:17–19 ("Q. What kind of matching rights did Fortune have in this transaction? A. I don't recall."); JX 9 (Maselli Dep.) at 75:5–78:5 ("Q. Under the terms of the merger agreement, what needed to occur for a go-shop participant to continue to negotiate with Norcraft regarding a possible sale after the go-shop period ended? . . . A. I don't know what the threshold was, but . . . if it was a sufficiently robust offer, they would have an opportunity to complete the transaction."); JX 11 (Reilly Dep.) at 121:3–130:20 ("Q. Did you personally ever consider what effect the tender and support agreements would have on the go-shop process? A. I can't recall. . . . To be honest with you, I'm not an expert in going private transactions, though I've been around for a while; and, in my estimation, the retention of both Ropes and Citibank and to rely on their advice and counsel with respect to the process was, you know, doing my duty. So that's kind of what we really looked to the experts to help us. . . . Q. What are matching rights? A. I have no idea. . . . Q. Okay. Well, do you know what type of matching rights Fortune had in Norcraft's go-shop process? . . . A. I don't recall. . . . Q. Do you recall any discussions among Norcraft's directors or officers with respect to Fortune's matching rights in this go-shop process? A. I do not. Q. Under the merger agreement that Norcraft signed with Fortune Brands, what needed to happen for a go-shop participant to continue to negotiate with Norcraft regarding a possible sale after the go-shop period ended? A. I don't recall."); *cf.* JX 1 (Ginter [CFO] Dep.) at 140:9–14 ("A. My knowledge of a go-shop is limited in that regard. I know the banks ran it for us and prepared a list of potential investors that may be interested in looking at Norcraft. But my knowledge of a go-shop is limited to that and what I learned during the process.").

- Any potential bidder had to value the TRAs—and provide for the satisfaction of Norcraft's payment obligations thereunder—within the Go-Shop Period, a task that Fortune had several months to complete (and struggled to navigate successfully, even with the assistance of expert tax advisors)[278];

- Fortune had an unlimited match right under the Merger Agreement, which gave Fortune four business days to match a superior proposal by a third-party bidder and two business days to match any subsequent proposal by the same bidder[279];

- In order to proceed with an alternate transaction, Norcraft had to receive a "Superior Proposal" by the end of the Go-Shop Period, "essentially requir[ing] the bidder to get the whole shebang done within the [Go-Shop Period]."[280] This requirement was made more onerous by the TRAs' interaction with the Merger Agreement's go-shop provisions, allowing "Fortune [to] close its tender offer for the 54 percent [of Norcraft common stock] before Norcraft [could] terminate the merger agreement, because Norcraft [couldn't] terminate on the possibility of a superior proposal. [Rather, Norcraft could] only terminate after [it had] given Fortune four days to match. And the four days [could] go beyond the tender offer expiration."[281]

---

[278] JX 5 (Klein Dep.) at 137–139; JX 11 (Reilly Dep.) at 164–165; JX 130 (Feb. 9, 2015 RBC presentation regarding TRA value); JX 162 (Mar. 10, 2015 RBC email attaching questions regarding TRAs).

[279] JX 221 (Merger Agreement) § 5.4(g); *see Lender Processing*, 2016 WL 7324170, at *25 ("In this case, the most persuasive explanation is that the existence of an incumbent trade bidder holding an unlimited match right was a sufficient deterrent to prevent other parties from perceiving a realistic path to success. . . . Without a realistic path to success, it made no sense to get involved."). Fortune's Vice President of M&A confirmed that "the team at Fortune understood that unlimit[ed] matching rights would discourage potential bidders in a go-shop process." JX 12 (Baab Dep.) 99–100. And, Fortune's CEO touted Fortune's match right when instructing RBC how to dissuade potential go-shop participants from bidding. JX 232 (e-mail chain between RBC, Klein and other members of Fortune's deal team, Apr. 7, 2015).

[280] *In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 119–20 (Del. Ch. 2007).

[281] TT 289:1–7 (Subramanian).

- On April 14, 2015, about two weeks into the thirty-five-day Go-Shop Period, Fortune launched Tahiti's tender offer,[282] triggering the TSAs and causing 53.6% of Norcraft's outstanding shares to be committed to supporting the Norcraft-Fortune transaction absent a superior proposal[283]; *and*

- In a fit of bad judgment, RBC attempted to contact and dissuade possible bidders from topping Fortune's bid during the go-shop.[284]

Presented with this factual record, I am not persuaded that Norcraft's go-shop process provided a meaningful market check that resulted in a transaction price derived from the "collective views of many sophisticated parties with a real stake in the matter."[285] Accordingly, I do not accord any weight to the deal price in my fair value calculus.[286]

---

[282] PTO ¶ 2ee. As noted, the Go-Shop Period began on March 30, 2015. PTO ¶ 2cc.

[283] JX 229 (Buller TSA); JX 230 (SKM TSA); JX 231 (Trimaran TSA).

[284] JX 232 (e-mail chain between RBC, Klein and other members of Fortune's deal team, Apr. 7, 2015) (RBC describing its planned efforts to dissuade potential buyers); *id.* (Klein expressing his interest in RBC "shutting the door on [potential buyers] and their willingness to look at [Norcraft]").

[285] *DFC*, 172 A.3d at 366. Respondent advanced deal price less synergies as reflecting Norcraft's fair value. Accordingly, it was Respondent's burden to prove the reliability of Norcraft's deal process. Respondent, however, failed to meet that burden—its witnesses struggled to recall basic aspects of the deal process and its valuation expert presented only a cursory, mostly conclusory, analysis of that process. Petitioners, on the other hand, presented credible evidence demonstrating that deal price less synergies is not a reliable indicator of Norcraft's fair value.

[286] This, of course, means that I give no weight to Austin Smith's deal price less synergies valuation.

### 3. Insufficient Evidence to Consider the Efficient Market Hypothesis

Following our Supreme Court's renewed endorsement of the efficient capital market hypothesis in *Dell*, I requested that the parties submit supplemental post-trial briefing addressing whether Norcraft's unaffected trading price was probative of Norcraft's fair value on the Merger date.[287] Because this case was tried before the Supreme Court's decision in *Dell*, the parties presented limited evidence at trial respecting Norcraft's trading history and the market for its stock. Consequently, the parties had a rather limited record to draw upon when addressing this issue in their supplemental submissions.[288]

To the extent the trial evidence is informative at all on this issue, it does not support assigning any weight to Norcraft's unaffected trading price for purposes of determining Norcraft's fair value on the Merger date. Norcraft had a limited public trading history given that it had just completed an IPO eighteen months before the Merger.[289] What trading did occur following the IPO was relatively limited, an

---

[287] D.I. 91.

[288] *See AOL*, 2018 WL 1037450, at *10, n.118 (declining to engage in an extensive analysis of the efficient market hypothesis when the parties did not present either an argument to that effect or sufficient evidence to allow the court to undertake the analysis on its own).

[289] JX 216 (e-mail from RBC to Biggart, Mar. 29, 2015, attaching RBC presentation on Norcraft) at FB0047792, FB0047795.

unsurprising phenomenon given the niche market in which Norcraft operated.[290]

The analyst coverage of Norcraft's stock was relatively sparse.[291] Based on this

record, I am unable to conclude that the market for Norcraft's common stock was

efficient or semi-strong efficient.[292] Absent that finding, I do not assign any weight

to Norcraft's unaffected trading price as an indicator of Norcraft's fair value on the

Merger date.[293]

## B. Norcraft's Fair Value under "Traditional Methods" of Valuation

Having determined that neither the Merger Price nor Norcraft's unaffected

stock price provide a reliable indicator of the Company's fair value, I must now

consider the remaining valuation analyses presented by the parties' experts. In this

regard, our law is clear that:

---

[290] *See* JX 68 (Sept. 18, 2014 Fortune Presentation) at FB0089499; JX 215 (Citi Board Discussion Materials) at FB0049833.

[291] *See* JX 215 (Citi Board Discussion Materials) at FB0049845.

[292] *See Dell*, 177 A.3d at 25 ("A market [for a company's stock] is more likely efficient, or semi-strong efficient, if [the company] has many stockholders; no controlling stockholder; 'highly active trading'; and if information about the company is widely available and easily disseminated to the market." (quoting *DFC*, 172 A.3d at 373–74)).

[293] *See Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.*, 2018 WL 922139, at *24 (Del. Ch. Feb. 15, 2018) ("*DFC* and *Dell* teach that if a company's shares trade in a market having attributes consistent with the assumptions underlying a traditional version of the semi-strong form of the efficient capital markets hypothesis, then the unaffected trading price provides evidence of the fair value of a proportionate interest in the company as a going concern." (footnote omitted)).

In discharging its statutory mandate, the Court of Chancery has the discretion to select one of the parties' valuation models as its general framework or to fashion its own. The Court of Chancery's role as an independent appraiser does not necessitate a judicial determination that is completely separate and apart from the valuations performed by the parties' expert witnesses who testify at trial. It must, however, carefully consider whether the evidence supports the valuation conclusions advanced by the parties' respective experts.[294]

I have followed this guidance as I have worked through the experts' competing analyses here.

### 1. Comparable Companies and Precedent Transaction Analyses Are Not Reliable

As previously mentioned, both experts performed a comparable company analysis. Austin Smith also performed a precedent transaction analysis. "The utility of a comparable company [or precedent transaction] approach is dependent on the similarity between the company the court is valuing and the companies [or precedent transactions] used for comparison."[295] When there are no sufficiently comparable companies or precedent transactions, such analyses are unavailing in the search for fair value.[296]

---

[294] *M.G. Bancorp., Inc. v. Le Beau*, 737 A.2d 513, 525–26 (Del. 1999).

[295] *IQ Hldgs., Inc.*, 2013 WL 4056207, at *1 (quoting *Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *8 (Del. Ch. May 20, 2004)) (internal quotation omitted); *see also Merion Capital*, 2013 WL 3793896, at *5; James R. Hitchner, *Financial Valuation: Applications and Models* 291–93, 297 (4th ed. 2017) (cited in JX 21 (Clarke Rebuttal Report)).

[296] *In re Orchard Enters., Inc.*, 2012 WL 2923305, at *9 (Del. Ch. July 18, 2012) ("Reliance on a comparable companies or comparable transactions approach is improper where the

After carefully reviewing the evidence, I see no factual basis to rely on a precedent transaction or comparable company analysis as an indicator of Norcraft's fair value as of the Merger date. The parties agree that there had not been an acquisition of any publicly-traded, "dealer channel" cabinet manufacturer—or a satisfactorily comparable business[297]—in any temporal proximity to the Merger.[298] Nor were the parties (or their experts) able to identify any truly comparable companies that could support a reliable comparable company analysis.[299] It is,

purported 'comparables' involve significantly different products or services than the company whose appraisal is at issue, or vastly different multiples."); *see also* Hitchner, *supra*, at 292–93.

[297] *See* JX 13 (Biggart Dep.) at 75:1–76:23, 152:22–153:1 (explaining he could not recall any precedent transaction in the dealer channel since 2010). Many of the precedent transactions identified by Austin Smith preceded the Norcraft-Fortune Merger by three or more years during a time in which the housing market was still recovering from the Great Recession. *See* JX 20 (Austin Smith Report), Ex. 14 (Precedent Transaction Method) (showing that 11 out of the 16 transactions predated 2012). The remaining transactions involved very small, non-public companies, making them unfit for comparison. *See id.* Under these circumstances, I see no reason to dwell on a precedent transaction analysis in determining Norcraft's fair value on the Merger date. *See Merion Capital,* 2013 WL 3793896, at *5 ("The utility of a market-based method depends on actually having companies that are sufficiently comparable that their trading multiples provide a relevant insight into the subject company's own growth prospects."); *see also* Hitchner, *supra*, at 304–06.

[298] *See* JX 20 (Austin Smith Report), Ex. 14 (Precedent Transaction Method) (showing that 11 out of the 16 transactions predated 2012); JX 18 (Clarke Report) at 4 n.8; JX 21 (Clarke Rebuttal Report) at 6.

[299] *Cf.* JX 20 (Austin Smith Report) at 25–28 (explaining, "of the guideline public companies, [Norcraft] is most similar to (though smaller than) American Woodmark, the only other pure-play cabinet manufacturer," "Norcraft is significantly smaller than most of the guideline public companies based on revenue, EBITDA, or assets"); TT 510:10–13

therefore, unsurprising that neither expert relied on market-based approaches (comparable company or precedent transaction analyses) as the principal metric by which to value Norcraft.[300] Instead, they offered these valuations to corroborate the results they reached utilizing their preferred valuation methodologies.[301] Because I disagree that market-based valuation metrics provide any guidance here, I do not consider those metrics further.

## 2. The DCF Analysis

"[A] DCF analysis can provide the court with a helpful data point about the price a sale process would have produced had there been a robust sale process involving willing buyers with thorough information and the time to make a bid."[302]

> The basic premise underlying the DCF methodology is that the value of a company is equal to the value of its projected future cash flows, discounted to the present value at the opportunity cost of capital. Calculating a DCF involves three steps: (1) one estimates the values of future cash flows for a discrete period, where possible, based on contemporaneous management projections; (2) the value of the entity attributable to cash flows expected after the end of the discrete period must be estimated to produce a so-called terminal value, preferably using a perpetual growth model; and (3) the value of the cash flows for

---

(Clarke) ("I view Norcraft being somewhat unique in that regard. So these are not -- you know, these are not perfect comps.").

[300] JX 18 (Clarke Report) at 32, 55; TT 636:17–637:6 (Clarke); JX 20 (Austin Smith Report) at 29.

[301] JX 18 (Clarke Report) at 32, 55; TT 636:17–637:6 (Clarke); JX 20 (Austin Smith Report) at 29.

[302] *Dell*, 177 A.3d at 35.

the discrete period and the terminal value must be discounted back using the capital asset pricing model or "CAPM." In simpler terms, the DCF method involves three basic components: (1) cash flow projections; (2) a discount rate; and (3) a terminal value.[303]

### a. The Disputed Inputs

As is typically the case, the substantial delta between the experts' DCF valuations can be traced to their disagreements regarding the DCF inputs. Their most significant disagreements are: (1) whether to extend the Base Case projections by an additional five years; and (2) how to calculate Norcraft's beta in connection with estimating Norcraft's WACC. On the latter point, the experts disagree regarding (i) the selection of appropriate guideline public companies ("GPCs") for a proxy beta calculation and whether net debt or gross debt should be used to unlever the GPC betas and relever the resulting proxy beta[304]; and (ii) whether Norcraft's observed capital structure or a target capital structure should be used to relever the concluded

---

[303] *Merion Capital,* 2013 WL 3793896, at *10 (internal citation omitted).

[304] *See* Shannon P. Pratt & Roger J. Grabowski, *Cost of Capital: Applications and Examples* 223 (5th ed. 2014) (cited in JX 18 (Clarke Report)) ("Using betas of guideline public companies for estimating a proxy beta has been found to provide reasonably accurate estimates of the subject company"); Duff & Phelps, *2015 Valuation Handbook, Guide to Cost of Capital* 5-3 (2015) (cited in JX 18 (Clarke Report)); *Andaloro v. PFPC Worldwide, Inc.,* 2005 WL 2045640, at *15 (Del. Ch. Aug. 19, 2005). "A company's debt capital can be measured by [gross] debt or net debt, where net debt is equal to total debt *less* excess cash." JX 23 (Austin Smith Rebuttal Report) at 23 (emphasis in original).

beta when calculating Norcraft's cost of equity.[305] The experts generally agree on the remaining DCF inputs.

### i. Management Projections

"The most important input necessary for performing a proper DCF is a projection of the subject company's cash flows. Without a reliable estimate of cash flows, a DCF analysis is simply a guess."[306] While Norcraft's management (Buller and Ginter) prepared several sets of projections, the experts agree that the most reliable projections are the Base Case projections—and both experts relied on those projections in their primary DCF analyses.[307]

The record reflects that Norcraft management did not prepare long-term projections in the ordinary course of Norcraft's business.[308] Nevertheless, Buller and Ginter knew how to prepare long-term projections and they approached the Base

---

[305] The capital structure used to relever the subject company's unlevered beta should also be used when calculating its WACC (for weighting purposes). TT 854:17–857:10 (Austin Smith).

[306] *AOL*, 2018 WL 1037450, at *11 (quoting *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 332 (Del. Ch. 2006)). *See also* Shannon P. Pratt, Robert F. Reilly & Robert P. Schweihs, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* 156 (4th ed. 2000) (cited in JX 18 (Clarke Report)) (hereinafter "Valuing a Business").

[307] As noted, Austin Smith performed two additional DCF analyses, one relying on the Ginter 2014 Projections and another relying on a Capitalization of Cash Flow methodology. *See* JX 20 (Austin Smith Report) at 23–24. Neither analysis, however, formed the basis for her final conclusion regarding fair value. *See id.* at 1.

[308] JX 1 (Ginter Dep.) at 27:2–28:14, 34:5–10; JX 3 (Buller Dep.) at 101:20–24.

Case projections with a view to providing the Board with a reliable estimate of Norcraft's future financial performance.[309] When all was said and done, Buller and Ginter were confident they had prepared a set of realistic, reasonable projections upon which Citi and the Board could rely in assessing Norcraft's value during the course of negotiations.[310] While not perfect, I am satisfied that the Base Case projections provide a reliable foundation for a valid DCF.[311]

The experts' dispute regarding the Base Case projections does not turn on their reliability (or lack thereof), but rather on whether the projections should be extended

---

[309] JX 3 (Buller Dep.) at 115:8–18 (explaining that the Base Case projections were "something [management] felt very, very comfortable in doing"); *id.* at 114:11–22; JX 1 (Ginter Dep.) at 93:23–25 (stating the Board approved the Base Case projections); JX 11 (Reilly Dep.) at 55:9–19.

[310] JX 3 (Buller Dep.) at 115:8–18. *Cf. Petsmart*, 2017 WL 230359, at *12 (noting that the respondent company's management characterized their projections as "bordering on being too aggressive"—even "approaching 'insan[ity]'") (alteration in original) (internal quotation marks, footnote and record citation omitted).

[311] TT 473–75 (Clarke) (explaining why the Base Case projections are reasonable). Austin Smith found several "significant limitations" to the Base Case projections: (1) they were not created in the ordinary course; (2) they were not created using the same procedure as Norcraft's annual budgets (*i.e.*, bottoms-up); (3) they projected an additional five years of growth after two years of already achieved growth in a cyclical industry; and (4) Ginter and Buller, who prepared the Base Case projections, allegedly knew they were going to lose their jobs if the transaction was completed—introducing the possibility of bias. TT 734:10–736:14 (Austin Smith). Despite all of her concerns, however, Austin Smith relied on the Base Case projections for her primary DCF analysis. TT 737:13–23 (Austin Smith). *See In re Appraisal of Ancestry.com, Inc.*, 2005 WL 399726, at *18 (Del. Ch. Jan. 30, 2015) (noting that "in a number of cases Delaware Courts have relied on projections that were prepared by management outside of the ordinary course of business and with the possibility of litigation") (collecting cases).

by an additional five years. Clarke opined that the extension was necessary, while Austin Smith opined that a PGR should be applied at the end of the five-year Base Case projection period.

According to Clarke, extending the Base Case projections is necessary to capture Norcraft's future cash flows because "the Base Case [p]rojections had not reached [a] steady state at the end of the [five-year] projection period" and, therefore, "it would be inappropriate to apply a standard [PGR] at th[e] last year [of that period]."[312] To account for Norcraft's growth potential as of 2019, Clarke extended the Base Case projections by an additional five years—through 2024—"to gradually reduce growth rates over time until reaching [a 3.5%] PGR."[313]

Austin Smith, on the other hand, maintains that extending the Base Case projections is inappropriate because doing so forecasts growth that Norcraft almost certainly could not achieve. In this regard, she points out that the cabinetry industry is cyclical, as demonstrated by trends in (1) the industry's historical performance (growth and decline); and (2) the historical growth (and decline) of the residential

---

[312] JX 18 (Clarke Report) at 2.

[313] *Id.* 2–3. Clarke "gradually reduce[d] growth rates over time until reaching the PGR," *id.*, by applying a "straight line reduction in growth" from the end of the Base Case projections to the end of his additional five-year projection period. TT 606–607. According to Clarke, "if [he] had to use 2019 as the final year of [his] projections, [he] would need to use a higher [PGR of 4.4%] to account for the tapering of [Norcraft's] growth to a steady state." JX 21 (Clarke Rebuttal Report) at 27 n.62.

construction market.[314] Extending the Base Case projections by an additional five years implies a ten-year period of consistent growth following two years of already achieved growth. According to Austin Smith, projecting twelve years of steady growth for a business in the cabinetry industry is patently unreasonable.[315]

On this point, I find Austin Smith most credible. The evidence adduced at trial supports her view that the cabinetry industry is cyclical and follows the cycle of the residential construction market.[316] The evidentiary record also reflects that the residential construction market is projected to reach a "steady state" at or slightly before the last year of the Base Case projection period (2019).[317] Moreover, insofar

---

[314] JX 23 (Rebuttal Report of Yvette R. Austin Smith ["Austin Smith Rebuttal Report"]) at 5–6.

[315] See id. at 4–6.

[316] See JX 20 (Austin Smith Report) at 21–22 & Ex. 3 (Indexed Growth of Norcraft Adjusted EBITDA versus Key Economic Indicators 2013–2015); TT 21:8–9 (Eldridge) ("[B]uilding products companies are cyclical . . . . "); JX 23 (Austin Smith Rebuttal Report), Fig. 1 (Comparison of Normalized Growth Patterns); id. at Fig. 2 (Historical and Forecasted EBITDA Margins); TT 607:23–608:1 (Clarke) ("Q: Mr. Clarke, the cabinet business is cyclical, isn't it? A. Yes."); see also JX 23 (Austin Smith Rebuttal Report), Fig. 1 (Comparison of Normalized Growth Patterns); id. at Fig. 2 (Historical and Forecasted EBITDA Margins); JX 5 (Klein Dep.) at 312:4–10. In light of this determination, I decline to apply Petitioners' suggested 4.4% PGR since that PGR is based on an unrealistic assessment of Norcraft's future financial performance. See JX 21 (Clarke Rebuttal Report) at 27 n.62.

[317] See JX 112 (Gabelli Report) (stating, as of January 2015, "[w]e see a gradual recovery in housing that will materialize over the next several years"); JX 535 (Fortune Investor Presentation, "Maximum Long-Term Value," May 1, 2015) ("Expectation is for the housing market to return to steady state (1.5 million [new construction] starts and 5–6% [average] annual [repair and remodeling] growth) by 2017 or 2018."). According to "accepted financial principles," Dell, 177 A.3d at 22, "terminal value must reflect an

as Norcraft's own management was not inclined to project Norcraft's financial results beyond FY2019, I see no basis to do so *post hoc* for the sake of reaching a litigation result.

### ii. Norcraft's Estimated WACC

The parties also dispute how to calculate the applicable discount rate based on Norcraft's estimated WACC. More specifically, they dispute how to calculate Norcraft's beta in connection with estimating Norcraft's cost of equity capital (a key component of WACC).

The application of a discount rate to financial projections attempts to "convert the [subject company's] expected economic income stream to present value."[318]

---

appropriate estimate of sustainable growth." Pratt, *supra*, at 49. "[F]or cyclical businesses[] the discrete [projection] period commonly corresponds to the number of years or periods until the point is reached where the net cash flow represents an average base net cash flow expected over an *entire* business cycle," *i.e.*, until the midpoint of the cycle. *Id.* at 47 (emphasis supplied); *see also* Robert W. Holthavsen & Mark E. Zmijewski, *Corporate Valuation: Theory, Evidence & Practice* 216 (2014) ("[T]he steady state for a company in a cyclical industry should be at the midpoint of the cycle."). Clarke's extension of the Base Case projections posits a ten-year growth trend but does not account for cyclicality in the cabinetry industry and the impact of such cyclicality on Norcraft's free cash flows. *See* JX 14 (Clarke Dep.) at 60–61 (explaining his extension does not reflect cyclicality prior to 2025); JX 23 (Austin Smith Rebuttal Report), Fig. 1 (Comparison of Normalized Growth Patterns); JX 18 (Austin Smith Report), Fig. 1 (Norcraft Net Sales and EBITDA (Historical 2003-2014) (citing JX 99 (Norcraft Jan. 2015 Management Presentation))). *See also AOL*, 2018 WL 1037450, at *19 ("In a fast-paced industry with significant fluctuations, where management is hesitant to project beyond four years, using a three-stage DCF model or a ten year projection period seems particularly brazen.").

[318] Pratt, *supra*, at 8; *see also* Duff & Phelps, *supra*, at 10-15.

Where the discount rate is based on the subject company's WACC, the projected future cash flows and terminal value are discounted by the WACC to bring them back to present value.[319] A company's WACC represents the cost (to the company) of financing its business operations; it comprises the weighted average of the company's cost of debt and equity[320]:

$$\text{WACC} = \left(r_{equity} \times \frac{E}{V}\right) + \left(r_{debt} \times \frac{D}{V} \times (1 - t)\right)$$

*where:*

| | | |
|---|---|---|
| $r_{equity}$ | = | cost of equity capital |
| $E$ | = | market value of the company's equity |
| $r_{debt}$ | = | cost of debt capital |
| $D$ | = | value of the company's debt |
| $V = E + D$ | = | total value of the company's equity and debt |
| $t$ | = | applicable tax rate |

Here, both experts calculated Norcraft's cost of equity capital pursuant to CAPM.[321]

Following CAPM, a company's cost of equity is calculated as follows[322]:

---

[319] Pratt, *supra*, at 546 ("WACC generally works as a substitute for the enterprise-cash-flow discount rate."). *See also* Valuing a Business, *supra*, at 184.

[320] Valuing a Business, *supra*, at 184; Duff & Phelps, *supra*, at 10-16.

[321] JX 18 (Clarke Report) at 33; JX 20 (Austin Smith Report), Ex. 5 (WACC Calculation).

[322] Duff & Phelps, *supra*, at 2-13.

$$r_{equity} = r_{no\text{-}risk} + (\beta \times ERP) + SS$$

*where:*

| | | |
|---|---|---|
| $r_{no\text{-}risk}$ | = | risk-free rate of return |
| $\beta$ | = | beta coefficient of the subject company |
| *ERP* | = | equity risk premium |
| *SS* | = | size premium |

The experts generally agree on many of the relevant inputs to calculate Norcraft's WACC; both experts used the same risk-free rate of return (2.75%), equity risk premium (6.21%) and size premium (2.69%).[323] The experts differed, however, in their respective estimates of Norcraft's pre-tax cost of debt. Clarke estimated Norcraft's pre-tax cost of debt as 6.95%—based on "the average of the 15-year yield-to-maturity of B and BB rated bonds" as of the Merger date.[324] Austin Smith, by contrast, estimated Norcraft's pre-tax cost of debt as 5.85%—based on the "[a]verage of (a) BofA Merrill Lynch US High Yield B Effective Yield as of 5/12/15 [the Merger date] and (b) total return on Norcraft['s] [then-outstanding] term loan (including [the] effect of issuance discount)."[325]

---

[323] JX 21 (Clarke Rebuttal Report) at 27.

[324] JX 18 (Clarke Report) at 41.

[325] JX 20 (Austin Smith Report), Ex. 5 (WACC Calculation). The BofA Merrill Lynch US High Yield B Effective Yield "represents the effective yield of the ICE BofA[] [Merrill Lynch] US Corporate B Index, a subset of the ICE BofA[] [Merrill Lynch] US High Yield Master II Index tracking the performance of US dollar denominated below investment grade rated corporate debt publically issued in the US domestic market. This subset includes all securities with a given investment grade rating B." ICE BofAML US High Yield B Effective Yield, retrieved from FRED, Fed. Reserve Bank of St. Louis;

The experts' respective estimates of Norcraft's pre-tax cost of debt are both reasonable. As of the Merger date, Norcraft's long-term debt was rated "B2" by Moody's Global Credit Research and "B+" by Standard & Poor's, and the yield to maturity on high-yield U.S. corporate bonds with 10+ year maturity on that date was approximately 6.34%.[326] Accordingly, I use the average of the experts' respective estimates of Norcraft's pre-tax cost of debt (6.40%) for my DCF analysis.[327]

As to the estimation of Norcraft's cost of equity, the experts' principal point of disagreement concerns Norcraft's beta coefficient. "Beta is a measure of the

---

https://fred.stlouisfed.org/series/BAMLH0A2HYBEY (last visited July 24, 2018). By way of reference, Citi used a pre-tax cost of debt of 5.3% in its calculation of Norcraft's WACC and RBC used 4.5%. *See* JX 18 (Clarke Report) at 41 n.91.

[326] JX 267 (Norcraft FY2014 10-K) at 21; ICE BofAML US High Yield B Effective Yield, retrieved from FRED, Fed. Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/BAMLH0A2HYBEY (last visited July 24, 2018); S&P U.S. High Yield Corporate Bond 10+ Year Index, *available online at* https://us.spindices.com/indices/fixed-income/sp-us-high-yield-corporate-bond-10-year-index (last visted on July 24, 2018). The experts do not challenge each other's estimates of Norcraft's pre-tax cost of debt. *See* JX 21 (Clarke Rebuttal Report) at 31 ("Austin Smith's conclusion [regarding Norcraft's pre-tax cost of debt] is in the range of reasonableness given Norcraft's improving performance and generally positive industry outlook as well being consistent with the financial advisors' cost of debt estimate.").

[327] This average figure tracks the ICE BofA Merrill Lynch US High Yield B Effective Yield as of the Merger date (6.39%) and the S&P U.S. High Yield Corporate Bond 10+ Year Yield to Maturity as of that date (6.34%). ICE BofAML US High Yield B Effective Yield, retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/BAMLH0A2HYBEY (last visited July 24, 2018); S&P Dow Jones Indices LLC, S&P U.S. High Yield Corporate Bond 10+ Year Index, *available online at* https://us.spindices.com/indices/fixed-income/sp-us-high-yield-corporate-bond-10-year-index (last visited on July 24, 2018).

systematic risk of a stock; the tendency of a stock's price to correlate with changes in the market. . . . [B]etas for equity capital are used as a modifier to the equity risk premium [] in the context of [calculating a company's cost of equity]."[328]

A company's beta is measured by tracking relative change in the trading price of its stock over a discrete time period (the "lookback period"), with a set frequency (*e.g.*, daily, weekly, monthly).[329] When there is insufficient data on the trading history of a company's stock, the company's "beta must be an estimate based on the [observed] betas of comparable, publicly traded companies" (*i.e.*, a "proxy beta").[330] Observed betas are *levered* betas; they reflect a company's operating risk *and* its financial risk.[331] Thus, when calculating a proxy beta, one must "unlever" each GPC's observed (levered) beta to remove the debt-related risk(s) of that particular GPC.[332] Once the GPC betas are unlevered, and the mean or median of those betas is calculated, the unlevered summary measure beta (*i.e.*, the unlevered proxy beta)

---

[328] Duff & Phelps, *supra*, at 5-1.

[329] *Id.* at 5-3.

[330] *Id.*; Pratt, *supra*, at 223. When calculating a company's beta, change in the trading price of the company's stock is measured relative to change in the returns of the overall market (or a proxy therefor) over the relevant observation period. JX 18 (Clarke Report) at 34.

[331] JX 18 (Clarke Report) at 34–35.

[332] *See* Duff & Phelps, *supra*, at 5-25 and 10-17.

must be relevered to add back financial risk.[333] The relevant financial risk, however, is the subject company's not the GPCs'.[334]

The experts generally agree that there is insufficient information regarding Norcraft's own beta to allow a reliable beta calculation based solely on that information—a function of Norcraft's limited trading history.[335] Accordingly, they agree that the use of a proxy beta is appropriate. They disagree, however, as to (1) which GPCs should be used to derive the proxy beta; (2) whether gross debt or net debt should be used to unlever the GPC betas and relever the resulting unlevered proxy beta; and (3) whether Norcraft's observed capital structure or a target capital structure should be used to relever the proxy beta.

I begin with the first point of disagreement—appropriate GPCs. Clarke used four GPCs for his proxy beta calculation—American Woodmark, Masonite, PGT and Ply Gem[336]—which he selected by applying a set of comparability-related

---

[333] *See* JX 18 (Clarke Report) at 34–35.

[334] *See* Duff & Phelps, *supra*, at 10-21; Pratt, *supra*, at 244.

[335] *See* JX 18 (Clarke Report) at 37–39; JX 23 (Austin Smith Rebuttal Report) at 18–20. While Clarke found Norcraft's observed beta "statistically relevant," he did not rely upon that beta beyond using it to define the lower end of a range of betas. He ultimately selected the higher end for his DCF. *See* JX 18 (Clarke Report) at 37–39.

[336] JX 18 (Clarke Report) at 51. Clarke notes in his report that RBC used all four of his chosen companies and Citi used three of the four in their respective analyses of Norcraft. *Id.*

86

screening criteria.[337] After selecting these four GPCs, Clarke then calculated each GPC's beta over a two-year lookback period (measured weekly) and a one-year lookback period (measured daily)—both periods relative to the Merger date—and unlevered each observed GPC beta using the gross debt of the corresponding GPC.[338] This led Clarke to derive an (unlevered) proxy beta for Norcraft of 0.80 based on the mean and median of the unlevered GPC betas.[339]

Austin Smith, by contrast, identified sixteen GPCs for her proxy beta calculation; the four companies selected by Clarke and twelve additional companies,

---

[337] *Id.* at 48–49. Clarke's screening criteria were: (1) public company; (2) industry classification of "Building Products"; (3) 2014 Calendar Year Revenue between $40 million and $4 billion; (4) primary geographic location in the U.S. or Canada; and (5) no recent major divestures or pending significant acquisitions. *Id.* Clarke's application of these criteria yielded a set of sixty-five companies, which Clarke then screened "for companies with a minimum expected EBITDA margin of 7.5% for fiscal year 2016 (approximately half of Norcraft's EBITDA margins) and a maximum expected EBITDA margin of 22.5% for fiscal year 2016 (approximately 50% above Norcraft's margins). In addition, [he] screened for companies that had forecasted 2016 revenue growth between 5% (approximately half of Norcraft's expected growth) and 15% (approximately 50% above Norcraft's expected growth). Based on those two criteria, the 65 companies were reduced to 28." *Id.* at 50. Clarke then determined that four of those companies—his four chosen GPCs—"had a primary business in manufacturing products for the [repair and remodeling] and/or new construction residential home construction [markets]." *Id.*

[338] *Id.* at 38 & sched. 5-C; JX 517 (native Excel version of Clarke's DCF model).

[339] JX 18 (Clarke Report) at 39 ("An unlevered beta of 0.80 is slightly above the median and average of the one-year daily betas of the [GPCs] (0.75 to 0.79) while slightly below the median and average two-year weekly betas of the [GPCs] (0.81 to 0.87)."). Clarke relevered his concluded unlevered beta for Norcraft based on Norcraft's actual (observed) capital structure as of the Merger date (75% equity, 25% debt, per Clarke). *Id.*, sched. 5-B. This resulted in a relevered beta for Norcraft of 0.97. *Id.*

including Fortune and Masco.[340] Having selected these sixteen GPCs, Austin Smith derived a proxy beta for Norcraft based on the median of the unlevered GPC betas, measured weekly over a two-year lookback period—relative to the Merger date—and unlevered using each GPC's net debt.[341] This resulted in an unlevered proxy beta for Norcraft of 1.02.[342]

Each expert disputes the suitability of the other's selected GPCs. According to Clarke, Austin Smith's selected GPCs "were either not comparable [to Norcraft] and/or were going through significant restructuring events that impacted their historical betas."[343] Austin Smith, for her part, maintains that Clarke's methodology for selecting GPCs is "fundamental[ly]" flawed, principally because: (i) it "results

---

[340] JX 20 (Austin Smith Report) at 26 & Ex. 4 (Beta Calculation). The other ten GPCs were: Armstrong World Industries, Inc., Beacon Roofing Supply, Inc., Builders FirstSource, Inc., Caesarstone Ltd., Continental Building Products, Inc., Mohawk Industries, Inc., Patrick Industries, Inc., Quanex Building Products Corporation, Trex Company, Inc. and Universal Forest Products, Inc. *Id.*, Ex. 4 (Beta Calculation). Austin Smith divided her sixteen GPCs into two groups: Group I (comprising American Woodmark, Masco and Fortune), "which consists of companies operating specifically (though not exclusively) in the cabinet market, and Group II [comprising the rest of the GPCs], which consists of companies operating in the general residential building products sector." *Id.* at 26.

[341] *Id.*, Exs. 4 (Beta Calculation) and 5 (WACC Calculation).

[342] *Id.*, Exs. 4 (Beta Calculation) and 5 (WACC Calculation). Austin Smith relevered her concluded unlevered beta for Norcraft based on a target capital structure comprising 86% equity and 14% debt. *Id.*, Ex. 5 (Calculation of WACC). This yielded a relevered beta for Norcraft of 1.12. *Id.*

[343] JX 21 (Clarke Rebuttal Report) at 28.

in the exclusion of two of the three publicly-traded cabinet manufacturers: Fortune . . . and Masco"; and (ii) it yields a relatively small set of companies, all but one of which manufacture products other than cabinets—meaning they are less comparable to Norcraft than Fortune and Masco.[344]

Both experts present valid arguments. After considering the evidentiary record, I have determined to derive a proxy beta for Norcraft based on the weekly observed betas of Fortune, Masco, American Woodmark, Masonite, PGT and Ply Gem, measured over a two-year lookback period (relative to the Merger date). I acknowledge the size difference between Norcraft, on one hand, and Fortune and Masco, on the other, but there are few publicly-traded, "dealer channel" cabinet manufacturing businesses operating in the United States from which to draw.[345] To account for this dynamic, I have selected a set of GPCs that includes publicly-traded companies directly competing with Norcraft (Fortune, Masco and American Woodmark), and also public companies operating in the same general industry that are more comparable in size to Norcraft (Masonite, PGT and Ply Gem).[346] Since

---

[344] JX 23 (Austin Smith Rebuttal Report) at 17.

[345] *See* JX 112 (Gabelli Report) at CITI-00053582.

[346] *See* Pratt, *supra*, at 223 ("The more guideline companies used in the sample size, the better the accuracy."); *id.* ("The accuracy is also enhanced if the guideline public companies are reasonably close in size to the subject company. When the guideline public companies are larger than the subject company, the beta estimate for the subject company is likely biased low because of the propensity of betas of larger companies to be smaller than the betas of smaller companies."). My selection of GPCs is further supported by RBC

neither party has provided me with a principled way to assign different weights to the betas of individual GPCs, I have determined to derive the proxy beta by taking the median of the unlevered GPC betas.[347]

As to the question whether to use gross or net debt for unlevering and relevering purposes, I have determined that Clarke's approach (gross debt) is most appropriate. I consulted the finance literature cited by both experts with regard to this issue and have come to the conclusion that using gross debt is the more generally accepted approach when applying the *Hamada* unlevering and relevering formulas

---

and Citi's choices of GPCs. RBC included all six of the selected companies, JX 216 (Mar. 29, 2015 e-mail from RBC to Biggart, attaching RBC presentation) at FB0047799, and Citi included five out of the six (it did not include Masonite). JX 505 (Citi Discussion Materials for the Fairness Opinion Committee) at CITI-00075076.

[347] *See* Pratt, *supra*, at 204 (explaining that to derive a proxy beta, one will take the median or an average of the unlevered betas). This approach also avoids additional risk for error that might flow from assigning different weights. *See* JX 530 (Bradford Cornell, *Corporate Valuation, Tools for Effective Appraisal and Decision Making* (1993)) at 68. As previously explained, Austin Smith derived a proxy beta for Norcraft based on the median of the unlevered betas of her selected GPCs. JX 20 (Austin Smith Report), Exs. 4 (Beta Calculation) and 5 (WACC Calculation). Clarke's proxy beta calculation, by contrast, took into account both the median and the mean of the unlevered betas of his selected GPCs. JX 18 (Clarke Report) at 39. My proxy beta calculation utilizes the median rather than the mean of the unlevered GPC betas. I took that approach to account for Masonite. Austin Smith and Clarke included Masonite in their respective analyses but both acknowledged that its business was less comparable to Norcraft than some of the other companies considered. Indeed, Masonite exhibited a significantly lower unlevered beta that risked distorting the Court's measurement of Norcraft's relative operating risk (if the Court were to use the mean for summary measure purposes).

(as both experts did),[348] which utilize "total debt" as an input.[349] I also find that considering net debt, while it might eliminate some of the drawbacks of the *Hamada* approach if done properly,[350] complicates the analysis and adds a significant risk of error to an already abstract process.

In her deposition, Austin Smith explained that using net debt requires "a judgment call" because "public companies don't report excess cash."[351] In essence, to derive net debt, one "look[s] at how the cash balances for th[e chosen] companies changed over time, and [then] look[s] at the relationship between cash and debt, and come[s] to an assessment."[352] If insufficient data about excess cash is

---

[348] JX 18 (Clarke Report), sched. 5-B (Cost of Equity Calculation per CAPM); JX 20 (Austin Smith Report), Exs. 4 (Calculation of Beta) and 5 (Calculation of WACC).

[349] Pratt, *supra*, at 243. The *Hamada* unlevering formula is as follows:

$$\beta_{unlevered} = \frac{\beta_{levered}}{\left(1 + \left((1 - \text{tax rate}) \times (\text{Total Debt/Equity})\right)\right)}$$

*Id.* at 247.

By corollary, the *Hamada* relevering formula is:

$$\beta_{levered} = \beta_{unlevered} \times \left[1 + (1 - \text{tax rate}) \times \frac{\text{Total Debt}}{\text{Total Equity}}\right]$$

*Id.*

[350] *See id.* at 262–63.

[351] JX 16 (Austin Smith Dep.) at 192:5–12.

[352] *Id.* at 192:13–16.

available, "total cash is assumed to equal excess cash."[353] Considering the many variables already at play in a DCF analysis (especially when deriving a proxy beta), I find that figures based on a "judgment call" are unreliable in the absence of a principled way to evaluate the soundness of the underlying "judgment." For all these reasons, I have utilized gross debt rather than net debt for unlevering and relevering purposes.

That takes me to the final beta-related dispute: the appropriate capital structure to relever the unlevered proxy beta. Austin Smith submits that a target capital structure based on the capital structure of comparable companies provides the most reliable input, while Clarke advocates the use of Norcraft's actual (observed) capital structure as of the Merger date. Austin Smith explains her choice by noting that Norcraft only went public in 2013 and its management had not indicated as of the Merger that it intended to maintain the Company's then-existing capital structure.[354] According to Austin Smith, it is likely that, over time, Norcraft's capital structure would come to resemble that of its peers.[355] Clarke counters that Norcraft's observed capital structure as of the Merger date was the "operative reality" of the Company at

[353] *Id.* at 192:18–21.

[354] *See* JX 23 (Austin Smith Rebuttal Report) at 22; TT 764:1–19 (Austin Smith).

[355] *See* TT 764:1–19; JX 23 (Austin Smith Rebuttal Report) at 22.

that time and, as such, is the appropriate capital structure to apply when relevering the unlevered proxy beta.[356]

Clarke has the better of this debate. While there are instances where using a target capital structure for relevering purposes would be appropriate,[357] especially where the target's capital structure is in flux, that is not the case here. It is true that, as of the Merger, Norcraft had operated for only eighteen months after its IPO. There is no evidence, however, that management intended to change Norcraft's capital structure, and any suggestion that it would do so is nothing more than sheer

[Remainder of Page Intentionally Left Blank]

---

[356] TT 506:11–17 (Clarke).

[357] *See* Duff & Phelps, *supra*, at 1-15, 1-16.

speculation.[358] Accordingly, I refer to Norcraft's observed capital structure as of the Merger (75% equity, 25% debt) to relever Norcraft's concluded unlevered beta.[359]

---

[358] TT 859:4–16 (Austin Smith) ("Q. And you testified earlier that you found no evidence in the record which would guide you in selecting what that target capital structure would be for Norcraft. Correct? A. That's right. Q. And so you had to use the data from comparable companies. Correct? A. Right. Q. And just to be explicit, there's no evidence in the record that Norcraft had any expectation of changing its capital structure after the transaction. Correct? A. That's correct."). Austin Smith herself recognizes that use of a target capital structure is only appropriate when "the company's existing capital structure is not equal to the company's target capital structure." JX 23 (Austin Smith Report) at 21–22. According to Austin Smith, Clarke's estimation of Norcraft's actual capital structure as of the Merger date is erroneous because it fails to account for Buller et al.'s ownership of Norcraft LLC units convertible into a 12.3% equity ownership interest in Norcraft (in the form of shares of Norcraft common stock). *Id.* at 21. Austin Smith's criticism in this regard is based on her (apparent) assumption that the conversion of the Norcraft LLC units into Norcraft common stock would not affect the per share trading price of that stock. *See id.* (calculating Norcraft's fully diluted market capitalization on the Merger date without adjusting for the potential dilutive effect of a Norcraft-LLC-unit-to-Norcraft-common-stock conversion on the per share trading value of Norcraft common stock). Upon reviewing the record, it is unclear how such a conversion would affect Norcraft's market capitalization—and, by extension, the equity component of Norcraft's capital structure. In addition, Austin Smith's calculation of Norcraft's fully diluted market capitalization on the Merger date does not account for the exercise of all outstanding options on Norcraft stock on that date. *See id.* ("The total equity in Norcraft['s] capital structure was $452 million . . . not the $396 [million] calculated by Mr. Clarke. The operating cash flows of Norcraft were supported not just by the equity of Norcraft Inc. but also by [Buller et al.'s] ownership interest [in Norcraft] LLC."); *but cf. id.* at 13 & n.25 ("[Norcraft's] implied fully diluted market capitalization was $532 million based on the transaction price of $25.50 [multiplied by] *20,869,976* fully diluted shares [outstanding].") (emphasis supplied). Moreover, as previously noted, Austin Smith's calculation of Norcraft's fully diluted shares outstanding as of the Merger date is inconsistent with the information set forth in Norcraft's Form 10-Q for Q1 FY2015 and the Funds Flow Memorandum prepared in connection with the Merger. The inclusion of all options on Norcraft stock outstanding as of the Merger date in the equity component of Norcraft's fully diluted capital structure (together with all Norcraft common stock and convertible Norcraft LLC units outstanding on that date) implies a capital structure of approximately 76% equity and 24% debt. I am satisfied, therefore, that Clarke's estimation of Norcraft's actual capital structure on the Merger date captures Norcraft's "operative reality" on that date. Accordingly, I have adopted that estimation.

### b. The Court's DCF Valuation of Norcraft

Like Clarke and Austin Smith, I begin my DCF analysis with the Base Case projections, adjusted to deduct for income tax expense in each of the projected years (based on a 38% tax rate). This adjustment yields the following figures for Norcraft's net operating profit after taxes ("NOPAT")[360]:

| FY2015-E (Stub) | FY2016-E | FY2017-E | FY2018-E | FY2019-E |
|---|---|---|---|---|
| $18.3 million | $31.8 million | $36.0 million | $41.9 million | $50.3 million |

I next adjust the NOPAT figures to obtain unlevered free cash flow figures for each projected year by (1) adding back non-cash charges—depreciation, amortization and stock compensation expense; (2) deducting Norcraft's capital expenditures; and (3) deducting year-over-year change in Norcraft's net working capital ("NWC"). My adjustments with respect to each item track those made by both experts.[361]

---

[359] For these same reasons, I refer to that same capital structure to calculate Norcraft's WACC (for weighting purposes).

[360] The calculation of Norcraft's NOPAT (and unlevered free cash flow) for FY2015 is based on the Base Case projections for the May–December 2015 period. Hence the "Stub" notation. Austin Smith took this same approach in her DCF analysis. JX 20 (Austin Smith Report), Ex. 6 (DCF Analysis). I have adopted Austin Smith's approach in this regard, given that the operative valuation date here is May 12, 2015 (the Merger date).

[361] *See* JX 18 (Clarke Report), sched. 2-A (DCF Analyis); JX 20 (Austin Smith Report), Ex. 6 (DCF Analysis). In calculating the period-over-period change in Norcraft's NWC, both experts excluded Norcraft's current TRA liability in each of the projected years. JX 20 (Austin Smith Report), Ex. 6 (DCF Analysis) ("Working capital excludes tax-related items."); *see* JX 517 (native Excel version of Clarke's DCF model). The rationale for this

The foregoing adjustments yield the following figures for unlevered free cash flow in each of the projected years:

| FY2015-E (Stub) | FY2016-E | FY2017-E | FY2018-E | FY2019-E |
|---|---|---|---|---|
| $20.8 million | $36.73 million | $40.06 million | $44.36 million | $49.84 million |

To calculate the present value of these unlevered cash flows, like Clarke and Austin Smith, I have applied a discount rate based on Norcraft's estimated WACC. My WACC calculation also uses CAPM to estimate Norcraft's cost of equity—based on the parties' common risk-free rate of return (2.75%), equity risk premium (6.21%) and size premium (2.69%)—and uses a 6.40% pre-tax cost of debt, which yields a post-tax cost of debt for Norcraft of 3.97% (again based on a 38% tax rate).

---

exclusion appears to be that Norcraft's payment obligations under the TRAs are non-ordinary-course, non-operating liabilities. *See* JX 18 (Clarke Report) at 29, 46. It is, therefore, more accurate to describe the experts' respective NWC-related computations as calculating period-over-period change in Norcraft's net operating working capital ("NOWC"). The Court's calculation of period-over-period change in Norcraft's NWC—or rather, its NOWC—likewise excludes Norcraft's current TRA liability in each of the projected years. I also note that both experts departed from the Base Case projections' forecast of Norcraft's "current portion of long-term debt" in FYs 2018 and 2019. *See* JX 20 (Austin Smith Report), Ex. 6 (DCF Analysis); JX 517 (native Excel version of Clarke's DCF model); JX 509 (native Excel version of Base Case projections). Both experts projected a $1.5 million figure for each year, whereas the Base Case projects zero for both years. *Compare* JX 20 (Austin Smith Report), Ex. 6 (DCF Analysis) *and* JX 517 (native Excel version of Clarke's DCF model), *with* JX 509 (native Excel version of Base Case projections). The record is unclear as to why, exactly, the experts chose to depart from the Base Case in this particular respect. Nevertheless, because both experts made the same adjustment to the Base Case projections with regard to Norcraft's "current portion of long-term debt" in FYs 2018 and 2019, I have followed suit.

To derive a beta for my cost of equity calculation, I have unlevered the observed weekly betas of my selected GPCs over a two-year lookback period relative to the Merger date, using the *Hamada* unlevering formula and gross debt rather than net debt. That computation yielded the following unlevered betas:

| Guideline Public Company | Levered Beta | Unlevered Beta |
|---|---|---|
| American Woodmark | 1.09 | 1.02 |
| Masco | 1.26 | 0.99 |
| Fortune | 1.15 | 1.07 |
| Masonite | 0.55 | 0.47 |
| PGT | 0.88 | 0.78 |
| Ply Gem | 1.60 | 0.98 |

The median of the unlevered GPC betas, 0.98, constitutes Norcraft's concluded unlevered beta. I then relevered that beta using Norcraft's observed capital structure of 75% equity and 25% debt (per Clarke's estimation), resulting in a levered beta for Norcraft of 1.187. Incorporating this levered beta into my WACC calculation, along with the other inputs already mentioned—again using Norcraft's observed capital structure—I derived a WACC for Norcraft of 10.60%. Applying Norcraft's concluded WACC to discount its projected future cash flows to present value, I have calculated the present value of those cash flows to be $149.7 million.

To calculate Norcraft's terminal value, I have used the Perpetuity Growth method (as did both experts),[362] which posits that terminal value equals the quotient

---

[362] JX 18 (Clarke Report) at 43 ("I calculated [Norcraft's] terminal value using the Perpetuity Growth Method[.]"); JX 20 (Austin Smith Report) at 20 ("To calculate

of (1) the subject company's terminal year free cash flow (here, $51.41 million); and (2) the applicable capitalization rate (here, 7.10%)[363]—discounted to present value using the applicable discount rate (here, Norcraft's WACC of 10.60%).[364] This yields a terminal value of $477.2 million.

Summing together the present value of Norcraft's projected unlevered cash flows ($149.7 million) and its terminal value ($477.2 million) results in an operating value for Norcraft of $626.9 million. To calculate Norcraft's total equity value, I then made the following adjustments to Norcraft's concluded operating value:

---

[Norcraft's] terminal value I relied upon the Gordon Growth (or Perpetuity Growth) model.").

[363] In the Perpetuity Growth model, the capitalization rate is calculated as the positive difference between the applicable discount rate and the subject company's PGR. JX 18 (Clarke Report) at 43. I have used Norcraft's WACC (10.60%) as the applicable discount rate and a 3.5% PGR for Norcraft, which together imply a capitalization rate of 7.10%.

[364] *Id.* Mindful of Clarke's justified criticism of Austin Smith's calculation of Norcraft's terminal year free cash flow, my calculation of that value adjusts for the fact that Norcraft's projected depreciation and amortization expense in the final year of the Base Case projections (FY2019) exceeds Norcraft's projected capital expenditures in that year by approximately $100,000. The adjustment entails implying a 3:4 relationship between Norcraft's depreciation/amortization expense and capital expenditures in perpetuity and thereby avoids "underinvesting in net PP&E." JX 21 (Clarke Rebuttal Report) at 25; *see* Hitchner, *supra*, at 138 ("[I]n a growing business, long-term annual estimated capital expenditures exceed annual depreciation, primarily due to inflation."); *see also* Gilbert E. Matthews & Arthur H. Rosenbloom, *Delaware's Unwarranted Assumption that Capex Should Equal Depreciation in a DCF Model*, (May 15, 2018), https://corpgov.law.harvard.edu/2018/05/15/delawares-unwarranted-assumption-in-dcf-pricing/ ("The assumption that depreciation equals capital expenditures is only appropriate if it is also assumed that there is no growth and no inflation. However, . . . the normalized capital expenditures of a [perpetually] growing company must materially exceed depreciation over time.").

98

- adding Norcraft's excess cash as of the Merger date, calculated as $62.6 million[365];

- adding the value of the TRA-related tax benefits realized by Norcraft in each of the projected years, calculated as $4.3 million[366]; *and*

- deducting Norcraft's long-term debt as of the Merger date, calculated as $147.5 million.[367]

---

[365] Both experts added Norcraft's estimated excess cash to its operating value in order to calculate the Company's total equity value. JX 18 (Clarke Report), sched. 2-A (DCF Analysis); JX 20 (Austin Smith Report), Ex. 6 (DCF Analysis). The experts differed, however, in how they calculated Norcraft's excess cash and thus reached different estimates of that figure. As noted, Austin Smith calculated Norcraft's excess cash on the Merger date based on the "Cash from Norcraft" figure in the "Funds Flow Memorandum" for the Merger ($54,396,335.01), JX 249 at 2, *less* a $20 million cash balance (cash for operations, per the Base Case projections), *plus* the product of (1) Norcraft's total options outstanding as of the Merger date (1,142,383) and (2) the weighted average exercise price of those options ($16.01). JX 20 (Austin Smith Report), Ex. 6 (DCF Analysis). Clarke, by contrast, calculated Norcraft's excess cash on the Merger date as the sum of (1) the cash balance indicated in Norcraft's Q1 FY2015 Form 10-Q ($63,135,000), JX 248 at 4, and (2) the Merger-related fees indicated in that same filing ($1.2 million), *less* $20 million cash for operations (per the Base Case projections). JX 18 (Clarke Report) at 45. I have adopted Clarke's approach, but have added to his excess cash figure Norcraft's cash receipts from the exercise of all options outstanding on the Merger date (1,142,383) at the weighted average exercise price ($16.01). JX 248 (Norcraft's Q1 FY2015 Form 10-Q) at 14. I find that this holistic approach best approximates Norcraft's "operative reality" as of the Merger date.

[366] Clarke valued the TRA-related tax benefits realized by Norcraft in each of the projected years at $4.4 million, JX 18 (Clarke Report) at 46, while Austin Smith valued them at $4.2 million. JX 20 (Austin Smith Report), Ex. 7 (Tax Characteristics Analysis). Having considered each expert's (quite complicated) approach to valuing those tax benefits, I find that both approaches—and both resulting valuations—are reasonable (they differ by approximately $200,000). Accordingly, I have adopted the average of the experts' respective value estimates.

[367] Like Clarke and Austin Smith, I have drawn this figure directly from Norcraft's Q1 FY2015 Form 10-Q. JX 248 (Norcraft's Q1 FY2015 Form 10-Q) at 4; JX 18 (Clarke Report) at 47; JX 20 (Austin Smith Report), Ex. 6 (DCF Analysis).

These adjustments to Norcraft's operating value yield a total equity value for Norcraft of $546.3 million. Dividing Norcraft's total equity value by Norcraft's fully diluted shares outstanding as of the Merger date (20,880,123),[368] I conclude that Norcraft's equity value per share on that date was $26.16.

### 3. The Merger Price as a "Reality Check"

As explained above, I have determined that the Merger Price is not a reliable indicator of Norcraft's fair value as of the Merger date. That does not mean, however, that the Merger Price is *irrelevant* for purposes of the Court's fair value determination. To the contrary, it is appropriate to consider the Merger Price as a "reality check" on the Court's DCF valuation of Norcraft.[369] Insofar as I am obliged to articulate a principled, evidence-based explanation for the delta between the Merger Price and the Court's DCF valuation (here, $0.66 per share), I am satisfied that the process infirmities I have identified resulted in the Board leaving $0.66 per share on the bargaining table.[370] With that said, I am also satisfied that the delta

---

[368] JX 248 (Norcraft's Q1 FY2015 Form 10-Q) at 11.

[369] *See AOL*, 2018 WL 1037450, at *2 ("I take the parties' suggestion to ascribe full weight to a [DCF] analysis . . . [and thus] relegate transaction price to a role as a check on that DCF valuation: any such valuation significantly departing from even the problematic deal price here should cause me to closely revisit my assumptions.").

[370] I am mindful that "[t]he issue in an appraisal is not whether a negotiator has extracted the highest possible bid. Rather, the key inquiry is whether the dissenters got fair value and were not exploited." *Dell*, 177 A.3d at 33. Here, in light of the identified flaws in Norcraft's deal process (pre- and post-sign), I find it more likely than not that the Board

between the Merger Price and the DCF value is not so great as to cause me to question whether the DCF value is grounded in reality.[371]

## III. CONCLUSION

For the foregoing reasons, I have found the fair value of Norcraft shares as of the Merger date (May 12, 2015) was $26.16 per share. The statutory rate of interest, compounded quarterly, shall accrue from the date of closing to the date of payment. The parties should confer and submit an implementing final judgment within ten (10) days.

---

"left a portion of [Norcraft's] fundamental value on the table." *Verition P'rs Master Fund,* 2018 WL 922139, at *44.

[371] *See AOL,* 2018 WL 1037450, at *2.